## The Iron City Bank *versus* The City of Pittsburgh.

*Taxation of Bank Discounts.—Inviolability of Charters.*

A tax assessed upon the discount business of a bank is to some extent a tax upon its capital stock.

The doctrine of the cases of Fletcher *v.* Peck, 6 Cranch 87, State of New Jersey *v.* Wilson, 7 Id. 164, Trustees of Dartmouth College *v.* Woodward, 4 Wheaton 518, Providence Bank *v.* Billings, 4 Peters 514, and State Bank of Ohio *v.* Knoop, 16 How. 369, as to the inviolability of charters without the consent of the corporators, examined.

The conclusions of the United States Supreme Court stated thus:—

1. A grant of land, or of a corporate franchise by an Act of legislation, is a contract between the state and the grantee, the obligation of which a subsequent legislature cannot impair.

2. If the legislature, in creating a corporation, prescribe a rate of taxation, and expressly release the power to impose further taxes, or do not expressly reserve the power to themselves, a subsequent tax law does impair the obligation of the contract, and is void.

Where a bank obtained its charter under a law providing " that the capital stock of such bank shall not be subject to taxation for any other than state purposes," the legislature may, notwithstanding, authorize the imposition of taxes for other than state purposes, by virtue of the clause in the 25th section of the first article of the Constitution of Pennsylvania, as amended in 1838, &   which provides that " every such (bank) charter shall contain a clause reserving to the legislature the power to alter, revoke, or annul the same, whenever, in their opinion, it may be injurious to the citizens of the Commonwealth; in such manner, however, that no injustice shall be done to the corporators."

A general tax law for city purposes, applicable alike to all the banks of a great city, is not an act of injustice to corporators.

Under the Constitution of Pennsylvania, no corporate body in the state, with *banking or discounting privileges*, can obtain exemption from the imposition of taxes according to legislative discretion.

ERROR to the District Court of *Allegheny county.*

This was an amicable action in debt by the Mayor, Aldermen, and Citizens of Pittsburgh against the Iron City Bank, to recover the sum of $243.66 claimed to be due from the defendant to the plaintiff for city purposes, in which a case was stated for the opinion of the court below.

The case set forth the incorporation of the bank in 1857, with a capital of $400,000, under the banking law of 1850; its organization as a bank of issue, that the profits of its discount business for two years were included in and formed part of the semi-annual dividends which had been regularly declared; the Act of June 4th 1859, authorizing the Councils of Pittsburgh to assess and collect for the use of the city an annual business tax not exceeding one-third of a mill per dollar on the average quarterly discount business of all banks, &c., doing business in the city; and an ordinance passed October 6th 1859, directing the city assessor to assess before the first Monday in May annually *inter alia,* on the average quarterly discount business of all banking

[The Iron City Bank v. The City of Pittsburgh.]

institutions doing business in said city, a tax of one-third of one mill per dollar; that under this ordinance a tax amounting to $243.66 had been assessed, demanded in due form by the proper authority, and payment thereof refused by the bank; agreeing in the usual form for the entry of judgment for plaintiff or defendant as the court should, on hearing the case, decide the point in controversy.

The court below entered judgment in favour of the plaintiff; whereupon the defendant sued out this writ, assigning this judgment for error.

*Penny & Sterret*, for plaintiff in error, argued that a bank charter was a contract between the state and the stockholders, and that the Act of 1859 was unconstitutional and void as impairing its obligation: Bank of Pennsylvania v. Commonwealth, 7 Barr 144. The attempt is indirectly to tax the capital of the bank for city purposes: Allegheny County v. Shoneberger, 1 Grant 35. The state may relinquish her right to tax either in terms or by implication, and has done so here: 10 Barr 43; 3 Howard 133; 2 Story on Const. 1371.

*Howard* and *Riddell*, for the city, contended that the tax is not on the capital stock or dividends, but on the average quarterly business of the bank. The construction of the contract contained in a charter is strict against the corporation, but liberal in favour of the state: Bank of Pennsylvania v. Commonwealth, 7 Harris 144. The right of taxation is an incident of sovereignty which can only be given up in express terms: 1 Hill 616; 2 Hill 353; 25 Wend. 686; 10 Ohio Rep. 91; 2 Gill 487; 12 Mass. 252; 3 Howard 133; 4 Peters 514. The capital stock, and the general business and dividends of a bank, are capable of a separate and distinct valuation: Easton Bank v. Commonwealth, 10 Barr 442.

The opinion of the court was delivered, January 7th 1861, by WOODWARD, J.—The Iron City Bank was incorporated in 1857, subject to a tax on its dividends according to the scale prescribed in the 21st section of our general banking law of 16th April 1850, and subject also to the taxation of its stock in the manner prescribed in the 33d section of the Act of 29th April 1844. This section was omitted from the general law of 1850, but was restored by the Act of 27th of April 1852, the first section of which concludes with a proviso *"that the capital stock of such banks shall not be subject to taxation for any other than state purposes."*

The charter of the Iron City Bank therefore is to be read as if these several sections of our previous legislation had been

[The Iron City Bank *v.* The City of Pittsburgh.]

inserted, as essential conditions when it was granted. The prescribed taxes on stock and dividends were to be paid by the bank, for state purposes, and there was nothing to prevent the legislature from taxing it farther for state purposes, but its capital stock was not to be subject to taxation for any other than state purposes. Such were the rights and liabilities of the bank for the first two years of its existence.

But on the 4th of January 1859, the legislature empowered the councils of the city of Pittsburgh to levy, assess, and collect, for the use of the city, an annual business tax, not exceeding one-third of one mill per dollar on the average quarterly business of all forwarding and commission merchants, brokers, banks, banking institutions, and on the average quarterly receipts of insurance companies, insurance agencies, express companies, and telegraph companies doing business in said city.

And by an ordinance of the 6th of October 1859, passed in pursuance of said Act of Assembly, the city councils levied a tax of a third of a mill per dollar "on the average quarterly discount business of all banks and banking institutions doing business in said city," and they ordained farther, that the "average quarterly discounts of banks should be ascertained by averaging the weekly statements thereof of notes and bills discounted during the first three months of each and every year."

The tax assessed upon the discount business of the Iron City Bank, under this ordinance, amounts for the year 1860 to $243.66, for which this suit was brought.

The defence is that the Act of Assembly of 1859 was unconstitutional and void, because it impaired the obligation of the contract between the Commonwealth and the bank, that the capital stock should not be subject to taxation for any other than state purposes. The only reply to this is, that it is not the capital stock, but the discount business of the bank that is taxed under the legislation of 1859.

We are not satisfied with this reply. It is true that most banks of discount do business greatly beyond their capital—they discount on their deposits and on their credit—but they do also discount on their capital. It is this indeed which attracts the confidence of depositors, and gives credit to the paper which they issue, so that the capital stock is the real foundation of all the business of the banks, and enters specifically into their discounts. If, therefore, the average quarterly discount business of the bank is to be taxed without taxing its capital, all that part of its business into which the capital enters must be laid out of the account, and the residue of its business only taxed. But how is the discrimination to be made? The city assessor does not seem to have attempted to make it, and he would probably have failed had he attempted it. It may be true

that part of the tax assessed is not a tax of the capital, but it is unquestionable that part of it is a tax of the capital. To tax the business which capital performs is to tax the capital. This is as certainly true as that taxation of capital is a burthen on the business in which it is engaged. The least then that can be said of the city's assessment is, that it is a tax on the capital of the bank to some extent, and, if to any extent, the bank has a right to complain of the infringement of its contract with the state. It has a right to say, the state stipulated that our capital stock should not be taxed for city purposes. Your tax is, in part at least, upon our capital stock, and until you distinguish that part, and withdraw it, we know not how much of your tax to pay, and therefore will pay nothing.

Did the legislature mean to tax the capital of the Pittsburgh banks for city purposes? We should be glad to be able to say, as we did in respect to the general tax laws in the case of the New York and Erie Railroad Co. v. Sabins, 2 Casey 244, that we saw no express intention to that effect, and that we would not imply the intention where another specific mode of taxation had been provided; but the language of the Act of 1859 is too full and precise to admit of such a construction. To say that they did not intend a tax of the capital, would be to impute to the legislature ignorance of the fact that the capital of banks enters into their "average quarterly business." That they must have known when they passed the act. It would be scandalous to doubt it. Then their language is plain, that "the average quarterly business" shall be taxed for city purposes, which is a plain though not a very direct way of saying that the capital shall be taxed for city purposes.

We are thus forced, by the most necessary construction, upon the conclusion that the Act of 1859 is in conflict with the proviso of the Act of 1852, which forms a part of the charter of the bank. And then the very grave question arises, is the Act of 1859 for that reason unconstitutional and void? What power does one legislature possess to restrain the action of a subsequent legislature? And does the power of restraint extend to that peculiar legislative function which is known as the taxing power? I propose to treat these questions in a very brief review of the principal judicial opinions which have been recorded for our instruction.

In the year 1810, the great case of Fletcher v. Peck, 6 Cranch 87, was decided in the Supreme Court of the United States. It was an action of covenant, founded upon a deed made by John Peck to Robert Fletcher, for part of a large body of lands purchased by James Gunn and others, in the year 1795, from the state of Georgia, the contract for which was made in the form of a bill passed by the legislature of the state.

[The Iron City Bank *v.* The City of Pittsburgh.]

By the Constitution of Georgia of 1789, the legislature had power to dispose of the unappropriated lands of the state. After the lands had been granted to Gunn and others, a subsequent legislature repealed the law under which the conveyance had been made, declared the conveyance void, and asserted the title of the state. Among other points, the court ruled that if a legislature may grant lands in fee simple, a subsequent legislature cannot take away the title of a *bonâ fide* purchaser for a valuable consideration from the first grantee, upon the ground that the original grant was fraudulent.

This proposition was sustainable on general principles of law and equity, without any support from that clause of the Federal Constitution which inhibits a state from passing any law impairing the obligation of contracts; but the court did not hesitate to apply that clause of the Constitution, and to hold that a grant of lands by a state legislature, is an executed contract within the meaning of the Constitution, and that its obligations cannot be impaired by a subsequent law of the state.

It is very apparent, that, whilst this case lays the foundation for the doctrine that an Act of Assembly may be a contract within the protection of the Constitution, it does not touch the taxing power of the government in the least.

Two years afterward, in the case of The State of New Jersey *v.* Wilson, 7 Cranch 164, that court made a decision which is usually cited as showing that an act of legislation may restrain the taxing power of a subsequent legislature.

A remnant of the tribe of Delaware Indians agreed with commissioners on the part of the then colony of New Jersey, to release their claim to all lands south of the river Raritan, in consideration that the government would purchase a tract of land on which they might reside. The legislature of 1758 passed an act to carry this arrangement into effect, and the act provided, among other things, "that the lands to be purchased for the Indians aforesaid, shall not hereafter be subject to any tax, any law, usage, or custom to the contrary thereof, in any wise notwithstanding."

In 1801, the legislature authorized the Indians to sell these lands, but said nothing about taxing them. In 1803, they were sold under this act to George Painter and others. In 1804, the legislature passed an act repealing the above-cited clause of the Act of 1758, and subjecting the lands to taxation.

The question was upon the validity of this law. It was submitted to the court without argument, and Chief Justice Marshall, after deciding that the exemption from taxation, though for the benefit of the Indians, was annexed to the land itself, and not to their persons, rested the judgment on the ground that the state might have insisted on a surrender of this privilege, as the sole

[The Iron City Bank *v.* The City of Pittsburgh.]

condition on which a sale of the property should be allowed; but as this condition was not insisted on, and the land was sold with the assent of the state, with all its privileges and immunities, the purchaser succeeded, with the assent of the state, to all the rights of the Indians, and he was entitled to the benefit of their contract.

The nature of the taxing power was not discussed in this case. Fletcher *v.* Peck was the only authority cited by the Chief Justice, and the state was treated as estopped by its own condition annexed to the title; after permitting and encouraging a purchaser for a valuable consideration to buy the title with the condition annexed. In other words, the state of New Jersey, as a dealer in lands, was held to be subject to the ordinary law of vendors.

The next case was that of the Trustees of Dartmouth College *v.* Woodward, 4 Wheat. 518, where, after great consideration, it was decided that the royal charter granted to the trustees of Dartmouth College, before the American revolution, was a contract within the meaning of that clause of the Constitution of the United States, which declares that no state shall make any law impairing the obligation of contracts, and that an act of the legislature of New Hampshire, altering the charter, without the consent of the corporation, in a material respect, was an act impairing the obligation of a contract, and therefore unconstitutional and void.

For many reasons this may be considered one of the most important judicial decisions that has ever been pronounced in this country. Though often questioned, it has generally been followed, and the doctrine may now be regarded as settled, in every state of the Union, that an act of incorporation, accepted and acted upon by the corporators, is a contract between the state and the corporators which a subsequent legislature may not impair. "All the cases," said Judge Black, in The Bank of Pennsylvania *v.* The Commonwealth, 7 Harris 151, "are saturated with this doctrine. It is sustained, not by a current, but by a torrent of authorities. No judge, who has a decent respect for the principle of *stare decisis*—that great principle which is the sheet-anchor of our jurisprudence—can deny that it is immovably established."

This is perhaps not too strong a statement of the authorities, where the question is upon the *repealability* of charters or their *modification in essential particulars*, without the consent of the corporators, but it would be quite too strong when applied to a question of taxation. The ruling in the Dartmouth College case was not upon the taxing power, and in the very case cited from 7 Harris we refused to regard a legislative imposition of taxes upon the dividends of the Bank of Pennsylvania as any invasion of its charter rights. A still stronger case to the same effect is

that of The Easton Bank *v.* The Commonwealth, 10 Barr 442, where it was held that a specific rate of taxation prescribed in the organic law, raised no implication of a legislative contract to impose no further burdens by way of taxation.

The Dartmouth College case having settled the general doctrine that legislative charters, like legislative grants of land, are contracts within the meaning of the Federal Constitution, the Supreme Court of the United States recognised it as applicable to banks in a question of taxation, in the case of The Providence Bank *v.* Billings, 4 P. 514, but refused in that case to consider a tax law as impairing the obligation of the contract, because the charter contained no stipulation against future taxation. This decision, pronounced in 1830, has been followed, as we have already seen, by this court, and the American courts have generally agreed that where a bank charter does not stipulate for exemption from further taxation, a law subsequently passed imposing further taxation is not a law impairing the obligation of the contract. I am not sure, however, that this is a fair statement of the present position of the Supreme Court of the United States, for in the case of the State Bank of Ohio *v.* Knoop, 16 How. 369, Justice McLean, speaking for a majority of that court, held this language: "Every valuable privilege given by the charter, and which conduced to an acceptance of it and an organization under it, is a contract which cannot be changed by the legislature, where the power to do so is not reserved in the charter. The rate of discount, the duration of the charter, *the specific tax agreed to be paid*, and other provisions essentially connected with the franchise, and necessary to the business of the bank, cannot, without its consent, become a subject of legislative action."

This is making the exercise of the taxing power to depend on a power reserved in the charter, which is a long step in advance of the doctrine in the Providence Bank case and our own cases, where it is held to be free unless expressly restricted by something in the charter. How earnestly several of the judges dissented from this position, may be seen both from the report of this case and of that which immediately follows it in the same book—The Ohio Life Insurance and Trust Company *v.* Debolt, 16 How. And how unsatisfactory this doctrine is to several state courts may be seen by what was said, and the authorities cited on the subject, in the case of Mott *v.* The Pennsylvania Railroad Company, 6 Casey 31.

I enter into no discussion of the nature of the taxing power, nor of the reasons that have been urged for and against the right of a legislative body to release or restrict it in behalf of a particular corporation; these topics will be found ably discussed in the cases I have referred to; but it must be remembered that the questions belong, for final adjudication, to the Supreme Court

[The Iron City Bank *v.* The City of Pittsburgh.]

of the United States. That court, having brought all corporate rights within the clause of the Federal Constitution, which disables state legislation, acquires jurisdiction, necessarily, over disputes which spring up between corporations and the states which create them, where the decision of the state tribunals is favourable to the sovereignty of the state. The only exception to this would seem to be in the case suggested by Justice McLean, where the power is reserved in the charter to do what the state is complained of for doing.

The conclusions of that court on this subject may be stated thus :—

1. A grant of land or of a corporate franchise by an act of legislation, is a contract between the state and the grantee, the obligation of which a subsequent legislature cannot impair.

2. If the legislature, in creating a corporation, prescribe a rate of taxation, and expressly release the power to impose further taxes, or do not expressly reserve the power to themselves, a subsequent tax law does impair the obligation of the contract, and is void.

The evident effect of these propositions is to place the taxing power of the state governments at the disposal of contracting parties. The legislature, representing the people, are one of the contracting parties—the corporators are the other. The theory is, that the legislature represent the people for the purpose of making contracts as well as for making laws; that the grant of a franchise is not merely an act of legislation, but is also a contract, and that the legislature holds the taxing power, and therefore may bargain it away, precisely as they hold and may grant the power of corporate franchises.

My purpose at this time is not to combat nor even question these conclusions, but to inquire whether they are applicable to the bank that is before us. We have seen that by the organic law of this bank certain specific taxes were imposed; that the power to levy further taxes *for state purposes* was not released, but that it was stipulated that the capital of the bank should not be subject to taxation for any other than state purposes. We have seen, also, that the law of 4th January 1859 does tax the capital stock of the bank for other than state purposes. The question then is, do the doctrines of the Supreme Court of the United States apply to this case?

I hold that they do not, for reasons which I proceed to state: The 25th section of the first article of the Constitution of Pennsylvania, as amended in 1838, says, that "no corporate body shall be hereafter created, renewed, or extended with banking or discounting privileges, without six months' previous public notice of the intended application for the same, in such manner as shall be prescribed by law; nor shall any charter for the purposes

[The Iron City Bank *v.* The City of Pittsburgh.]

aforesaid be granted for a longer period than twenty years; *and every such charter shall contain a clause reserving to the legislature the power to alter, revoke, or annul the same whenever, in their opinion, it may be injurious to the citizens of the Commonwealth; in such manner, however, that no injustice shall be done to the corporators.*" The Act of 1857, incorporating the Iron City Bank, does not contain such a clause, but it declares that the bank shall be organized, managed, and governed as is provided for by the act regulating banks, approved the 16th of April 1850, and be subject to all the provisions and restrictions, and have all the immunities and privileges, mentioned in said act and the several supplements thereto.

By the 53d section of the General Banking Law of 16th April 1850, the power to alter and revoke bank charters is reserved in the very terms of the above constitutional provision. Losing sight, then, of none of the "provisions, restrictions, immunities, or privileges" under which this bank was created, it may be said with great confidence that it accepted its charter under the express stipulation that the state sovereignty over it should remain unimpaired. The power to alter, revoke, or annul charters, whenever, in the opinion of the legislature, they become injurious to the citizens of the Commonwealth, was the utmost that was ever claimed in behalf of state sovereignty, and this the Iron City Bank conceded—subject to one only condition—that no injustice should be done to corporators. Whether this condition is to be judged of by the legislature or the courts may be a somewhat nice question. Generally, questions of justice and injustice are judicial in their nature, and I incline to think it is for the courts and not the legislature to decide whether the repeal or modification of a bank charter works injustice to the corporators. But assuming this to be so, it must also be assumed that the courts will never hold a tax law applicable alike to all the banks of a great city to be an act of injustice. We have repeatedly said that the taxing power is exclusively legislative, and not at all judicial, and that until the exercise of it became so extravagant and wanton as to be no longer in the nature of a legislative function, we would not attempt to arrest it. We would not see a citizen's property confiscated under pretence of taxing it. That would be a case of manifest injustice. But when the legislature thinks that the banks and other corporations doing business in a particular city, and enjoying the protection of its police and other facilities for business, should contribute a reasonable part of their profits to the support of that city, and accordingly authorizes them all to be taxed according to a uniform rate, it is not for the judiciary to revise the legislative discretion, and to pronounce such a tax law an act of injustice to the corporators. Resumption of the franchise, or abridgment

[The Iron City Bank *v.* The City of Pittsburgh.]

of corporate powers without compensation, might be injustice to corporators—a general tax law for city purposes is not.   But it will be said the injustice consists in imposing a tax in violation of the fundamental compact that none but state taxes should be imposed.   The answer is, you agreed, when you took your charter, that the legislature might, in their discretion, disregard that condition, and therefore it is not unjust to you that on a fair exercise of discretion they have determined to disregard it. To give that condition the great effect claimed for it, would be to nullify the constitutional provision which was designed to protect state sovereignty from the entanglements of legislative bargains with banks.   However it may be with other corporations— even if the doctrines of the federal courts should be held to exempt them from farther taxation, where they have obtained an express stipulation to that effect—no corporate body in Pennsylvania, with *banking or discounting privileges*, can claim the shield of those doctrines; because our Constitution forces upon the corporators the recognition and admission of an unimpaired state sovereignty to impose taxes according to legislative discretion. Every legislature sits under that constitutional grant of power, and since no legislature can repeal the Constitution, the stipulations of the legislature of 1857 with this bank could not abridge the powers of the legislature of 1859.   The power of taxation is one thing, whether applied to state, city, county, borough, or township taxes.   It is lodged with the legislature for exercise, according to its discretion, and in respect to banks, however it may be in respect to other corporations, it cannot be hampered by prior legislation.   The Constitution was made to prevent such a result, and you must alter the Constitution before a bank can plead an indefeasible right to be exempt from taxes, general or local, which a legislature prescribes in the ordinary course of legislation.

Another point may be taken.   It may be said that the Act of 1859 neither alters, revokes, nor annuls the charter, and therefore is not within the purview of this clause of our state Constitution.   Does it not "alter" the charter?   That is the very complaint that is urged.   If the charter says the bank shall pay no taxes but state taxes, and the Act of 1859 says it shall pay city taxes also, I think it quite clear that the charter is altered.   We are accustomed to speak of all the incorporating acts as constituting the charter, which is not strictly correct language, though accurate enough for all practical purposes.   The Constitution used the word charter in its loose and popular sense rather than in its strictest signification.   We regard, then, the general banking law of 1850 and its supplements as entering into and forming part of the charter of this bank, within the meaning of the word charter, as used in our state Constitution—and we look upon

the Act of 1859 as altering that charter, and because an ordinary tax law passed in pursuance of the reserved power, we hold it constitutional, without questioning any of the conclusions of the Supreme Court of the United States.

With a firm conviction that bank stocks are taxed beyond any other forms of property in the Commonwealth, with no disposition to encourage legislation that is founded on bonuses or releases of the taxing power, or repeal of privileges once granted to corporations, we are brought, nevertheless, to the conclusion that this tax is legal and constitutional, and therefore that the judgment should be affirmed.