# The City of Pittsburg *versus* The First National Bank of Pittsburg.

1. National banks are responsible only to the National Government and are as entirely independent of state legislation or interference as the army, navy, mint or courts of the United States.

2. A state cannot tax stock issued for United States loans.

3. Taxation of national banks by the states in any other way than that excepted by the Act of Congress of June 3d 1864, is unconstitutional.

4. The Act of Assembly of January 4th 1859, authorized the city of Pittsburg to tax banks, &c.; this tax is not within the terms of the 41st section of the Act of Congress of June 3d 1864, and cannot be imposed on a national bank.

February 28th 1867, at Philadelphia.   Before WOODWARD, C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

Error to the District Court of *Allegheny county*.

This was an amicable action of assumpsit between the city of Pittsburg, plaintiff, and The First National Bank of Pittsburg, defendants, commenced December 17th 1864, in which the following case stated was filed.

The First National Bank of Pittsburg was duly incorporated on the 5th day of August 1863, in pursuance of the Act of Congress of February 25th 1863, and immediately commenced, and has ever since continued, to carry on the business of banking at said city.

By an Act of Assembly of January 4th 1859, the councils of Pittsburg were authorized to levy and collect an annual business tax upon all banks and banking institutions doing business in said city, which Act of Assembly, with all supplements or subsequent acts, so far as applicable thereto, are made part of this case stated.

By an ordinance of said city of the 21st day of January 1864, a tax of 1⅔ mills on the dollar was assessed upon the average quarterly business of all banks and banking institutions established and doing business in said city, and the tax so assessed upon The First National Bank, for the year aforesaid, is $1467.60, which sum the bank has been duly notified and required to pay.

By an Act of Congress, the 3d day of June 1864, it is provided that in lieu of all existing taxes, every national banking association shall pay to the United States, a duty upon the average amount of its circulation, deposits and capital, which said act, so far as applicable, is made part of this case stated.

The question presented by the foregoing case is, whether the said bank is chargeable with the tax imposed upon its average business for the year 1864, by the Act of Assembly aforesaid, and the said ordinance of the councils of the city of Pittsburg.

[City of Pittsburg *v.* First National Bank.]

If the court should be of opinion that said First National Bank (defendant) is so chargeable and liable to pay said tax, then judgment to be entered in favor of the plaintiff for the sum of $1467.60, with costs; otherwise judgment for the defendant.

The court below entered judgment for the defendant, which was assigned for error by the plaintiff, who removed the case to the Supreme Court.

The case was originally argued at Pittsburg on the 23d of October 1865, when a re-argument was ordered.

*J. F. Slagle*, for plaintiff in error, cited Act of January 4th 1859, § 4, Pamph. L. 828; Act of Congress June 3d 1864, § 41, 2 Brightly's U. S. Dig. 60, pl. 41, § 45, p. 62, pl. 45; McCulloch *v.* The State of Maryland, 4 Wheat. 316; Osborn *v.* The United States Bank, 9 Id. 742; Bank of Commerce *v.* New York City, 2 Black 620; Van Allen *v.* The Assessors, 3 Wal. 573; McMaster *v.* The Commonwealth, 3 Watts 292; Fenlon's Petition, 7 Barr 175; Kirby *v.* Shaw, 7 Harris 258; Schenley *v.* Allegheny City, 1 Casey 128; Sharpless *v.* The City of Philadelphia, 9 Harris 160; Speer *v.* The School Directors of Blairsville, 14 Wright 150; Amendments to Constitution of U. S., Art. 10, Purd. 12; Farmers' and Mechanics' Bank *v.* Smith, 3 S. & R. 68; Moore *v.* Houston, Id. 178; Calder *v.* Bull, 3 Dallas 386; Buscoe *v.* The Bank of Kentucky, 11 Peters 257; Houston *v.* Moore, 5 Wheat. 1; Weaver *v.* Fegeley, 5 Casey 27; Sturgis *v.* Crowninshield, 4 Wheat. 122; McMillan *v.* McNeill, Id. 209; Gibbons *v.* Ogden, 9 Id. 199; Fox *v.* Ohio, 5 Howard 410, 1 Douglass 207; Cooley *v.* Wardens of Phila., 12 Howard 299; Cleveland P. & A. Railroad *v.* Franklin Canal Co., Pitts. L. J. Dec. 24th 1853, 9 Am. Law Reg. 148; Weston *v.* The City of Charleston, 2 Peters 449; Bank Tax Case, 2 Wall. 200; 1 Kent Com. 428; Marbury *v.* Madison, Cranch 137.

*Acheson* and *B. H. Brewster*, for defendant in error, cited The City of New York *v.* The Bank of Commerce, 2 Black 620; The Bank Tax Case, 2 Wall. 200; Act of Congress of 25th February 1863, § 15, Brightly's Dig. Sup. 1120; Act of Congress of June 3d 1864, § 41, 2 Brightly's U. S. Dig. 60, pl. 41; Acts U. S. 1864, p. 117, § 45, Brightly's Dig. p. 62, pl. 47; Act of Assembly January 4th 1859, §§ 4–5, Pamph. L. 828, 829; McCulloch *v.* The State of Maryland, 4 Wheat. 316; Osborn *v.* The Bank of the United States, 9 Id. 738; Weston *v.* The City Council of Charleston, 2 Peters 449; Brown *v.* The State of Maryland, 12 Wheat. 419; Dobbins *v.* The Commissioners of Erie County, 16 Peters 435; Bank of Commerce *v.* New York City, 2 Black 620; The Bank Tax Case, 2 Wall. 200; Van Allen *v.* The Assessors, 3

Id. 573; U. S. v. Weise, 2 Id. 12; Iron City Bank v. Pittsburg, 1 Wright 342.

The opinion of the court was delivered, November 7th 1867, by READ, J.—The revolutionary war and its debt produced the first Bank of the United States. The war of 1812 and its debt produced the second Bank of the United States. And the late rebellion and its debt have produced the present system of national banks spread over the whole country, and controlled and governed by a bureau in the treasury department, the chief officer of which is the comptroller of the currency. The principal object of this plan was to provide a national currency secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof. Associations for carrying on the business of banking were authorized, which from the date of their organization-certificates became bodies corporate for a period of twenty years.

No bank could have a capital of less than $50,000, and the whole capital must be actually paid up in six months, the first payment being 50 per cent., which must be paid in before it could be authorized to commence business, and one-third of such capital must be registered United States bonds deposited with and transferred to the treasurer of the United States, for which they may receive from the comptroller circulating notes equal in amount to 90 per cent. of such deposit, to be signed by the officers of the association using the same. The shares are to be $100 each and the stockholders are to be individually responsible for the debts of the association to the extent of their stock therein at the par value thereof in addition to the amount invested in their shares. These notes are to be received at par in all parts of the United States in payment of taxes, excises, public lands and all other dues to the United States except duties on imports, and also for all salaries and other debts and demands owing by the United States to individuals, corporations and associations within the United States, except interest on the public debt and in redemption of the national currency. These notes when presented must be redeemed at par in lawful money—that is, legal-tender notes— and every association must receive them at par for any debt or liability to such association. When the legal-tender notes are funded or withdrawn, then this national currency must be redeemed in gold and silver coin, which will then be the only lawful money. These associations may become depositaries and financial agents of the government, and then they shall receive and take at par all of the national currency bills, by whatever association issued, which have been paid into the government for internal revenue or for loans or stocks.

[City of Pittsburg *v.* First National Bank.]

Each association is to pay in lieu of all existing taxes a duty on its notes in circulation, its deposits and its capital stock, semi-annually to the treasurer of the United States.

The business of these associations is described in the law to be that of banking by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange coin and bullion; by loaning money on personal security; by obtaining, issuing and circulating notes according to the provisions of the act; and its usual business shall be transacted at an office or banking-house located in the place specified in its organization-certificate.

Such is the full and comprehensive description by Congress of the business of a national bank and which is asserted by the plaintiffs to be subject to municipal taxation under a state law.

These provisions show that the connection of the government with these associations is infinitely closer than it was with the former Banks of the United States as to capital, circulation and deposits, and that they are under the direct control and supervision of the financial department of the government. They are mere creations of the national government to whom alone they are responsible, and as entirely independent of state legislation or state interference as the army and navy, and the mint, and the judicial tribunals of the United States.

The Supreme Court of the United States decided nearly half a century ago that Congress had the power to incorporate banks, for that was the effect of their decision in McCulloch *v.* State of Maryland, 4 Wheat. 316, solemnly reaffirmed in Osborn *v.* Bank of the United States, 9 Id. 861. These cases also decided that a state could not tax it, the first case being a stamp tax on the notes of a branch, and the second a tax on one of its branches. "When a state taxes the operations of the government of the United States, it acts upon institutions created not by their own constituents, but by people over whom they claim no control. It acts upon the measures of a government created by others, as well as themselves, for the benefit of others in common with themselves. The difference is that which always exists and always must exist between the action of the whole on a part, and the action of a part on the whole—between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme."

"The court has bestowed on this subject its most deliberate consideration. The result is, a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the Constitution has declared."

In the last case C. J. Marshall says, p. 861, " While they seem to admit the right to preserve this corporate existence, they deny the right to protect it in its trade and business. If there be anything in this distinction it would tend to show that so much of the act as incorporates the bank is constitutional, but so much of it as authorizes its banking operations is unconstitutional." After discussing this question, he continues: " Deprive a bank of its trade and *business,* which is its sustenance, and its immortality, if it have that property, will be a very useless attribute. This distinction, then, has no real existence. To tax its faculties, its trade and occupation, is to tax the bank itself; to destroy or preserve the one is to destroy or preserve the other."

" The business of the bank constitutes its capacity to perform its functions as a machine for the money transactions of the government. Its corporate character is merely an incident which enables it to transact that business more beneficially."

" If the sound construction of the act be that it exempts the trade of the bank as being essential to the character of a machine necessary to the fiscal operations of the government from the control of the state, courts are as much bound to give it that construction as if the exemption has been established in direct terms."

" If the trade of the bank be essential to its character, as a machine for the fiscal operations of the government, that trade may be as exempt from state control as the actual conveyance of the public money. Indeed, a tax bears upon the whole machine, as well upon the faculty of collecting and transmitting the money of the nation as on that of discounting the notes of individuals. No distinction is taken between them." " Considering the capacity of carrying on the trade of banking is an important feature in the character of this corporation, which was necessary to make it a fit instrument for the objects for which it was created, the court adheres to its decision in the case of McCulloch against The State of Maryland."

A state cannot tax stock issued for loans made to the United States: Weston v. City of Charleston, 2 Peters 449. C. J. Marshall says, p. 467 : " The sovereignty of a state extends to everything which exists by its own authority or is introduced by its permission; but not to those means which are employed by Congress to carry into execution powers conferred upon that body by the people of the United States. The attempt to use the power of taxation on the means employed by the government of the Union in pursuance of the Constitution is itself an abuse, because it is usurpation of a power which the people of a single state cannot give."

And in the dissenting opinion of Justice Thompson in Brown

*v.* State of Maryland, 12 Wheat. 458, he recognises the same doctrine. " The Bank of the United States," said he, " could not be taxed by the states, because it was an instrument employed by the government in the execution of its powers ; it was called into existence under the authority of the United States, and of course could not have previously existed as an object of taxation by the states:" The tax was held unconstitutional because laid on the operations of the bank, and consequently a tax on the operations of an instrument employed by the government of the Union to carry its powers into execution ; and this instrument created by the government of the Union."

It was held, in The People of New York *ex rel.* Bank of Commerce *v.* The Tax Commissioners, 2 Black 620, that the capital of a state bank invested in the stocks of the United States was not liable to state taxation ; and in The Bank Tax Case, 2 Wall. S. C. U. S. 200, it was held that a tax laid by a state on state banks at a valuation equal to the amount of their capital paid in or secured to be paid in is a tax on the property of the institution, and when that property consists of stocks of the National Government the law laying the tax is void.

In the case before us, the first argument was at Pittsburg on the 23d October 1865, before four judges, and a re-argument being ordered, it took place before a full bench at Philadelphia on the 28th February 1867.

In this interval three more cases have been decided by the Supreme Court of the United States, which appear to settle the question entirely in conformity with the foregoing part of this opinion written nearly two years ago. In Van Allen *v.* The Assessors, 3 Wall. 573, the court held that the Act of June 3d 1864, rightly construed, subjects the shares of the banking associations authorized by it, and in the hands of shareholders, to taxation by the states under certain limitations set forth in the 41st section, and that such act thus construed is constitutional. The effect of this decision is, that taxation by the states of national banks in any other way than that excepted by the act itself is unconstitutional.

" The power of taxation under the Constitution," says Justice Nelson, " as a general rule, and as has been repeatedly recognised in adjudged cases in this court, is a concurrent power. The qualifications of the rule are the exclusion of the states from the taxation of the means and instruments employed in the exercise of the functions of the Federal Government." These national banks are recognised in the opinions of both the majority and minority of the court as the means and instruments employed in the exercise of the functions of the Federal Gov ment, and of course liable only to the limited state taxation. allowed by Congress.

[City of Pittsburg v. First National Bank.]

This decision was affirmed in People v. Commissioners, 4 Wall. 244, and in Bradley v. The People, Id. 459. On the 4th January 1859 (Pamph. L. 828), the legislature passed an act to enable the city of Pittsburg to raise additional revenue, by the 4th section of which the councils of said city were empowered " to levy, assess and collect for the use of the city an annual business tax not exceeding one-third of one mill per dollar on the average quarterly business of all forwarding and commission merchants, brokers, banks, banking institutions, and on the average quarterly receipts of insurance companies, insurance agencies, express companies and telegraph companies doing business in said city."

By the 5th section, if the cashier of a bank fails to pay said tax, then the treasurer of the city may levy and sell the property of the corporation by a ward constable under a warrant issued by the treasurer. By an ordinance of said city, a tax was assessed upon the quarterly business of all banks and banking institutions, doing business in said city, and the tax so assessed on the defendants for the year 1864 was $1467.67.

Without stopping to show that the Act of 1859 never could have contemplated a national bank, and that the provision for collection of the tax by a ward constable would be a singular mode of treating an institution established by the General Government, it would be sufficient to say that this tax is not within the terms of the 41st section, for it is not a tax on the shares of shareholders of the bank.

This law, and an ordinance under it of a similar character, was largely discussed by the present Chief Justice in The Iron City Bank v. The City of Pittsburg, 1 Wright 340.

The Chief Justice says, at p. 343: " Did the legislature mean to tax the capital of Pittsburg banks for city purposes? We should be glad to be able to say, as we did in respect to the general tax laws in the case of The New York and Erie Railroad Co., 2 Casey 244, that we saw no express intention to that effect, and that we would not imply the intention where another specified mode of taxation had been provided; but the language of the Act of 1859 is too full and precise to admit of such a construction. To say that they did not intend a tax of the capital, would be to impute to the legislature ignorance of the fact that the capital of banks enters into their ' average quarterly business.' That they must have known when they passed the act. It would be scandalous to doubt it. Then their language is plain that ' the average quarterly business' shall be taxed for city purposes, which is a plain, though not a very direct, way of saying that the capital shall be taxed for city purposes."

It is clear, then, upon principle and authority, that this is a tax which cannot be imposed by the state directly or through the

[City of Pittsburg *v.* First National Bank.]

agency of the city of Pittsburg upon the defendants, a national institution, incorporated under the Act of Congress.

If, therefore, this bank be considered as embraced by the provisions of the Act of 1859, then this tax is unconstitutional, whether it be a tax on the capital or on the trade and business of the institution, which the Supreme Court say is an " instrument employed in the exercise of the functions of the Federal Government."

It is not necessary to fortify these decisions by those of the state courts, but we shall mention them in order to show that they have not been overlooked. In New Jersey, in the case of The State *v.* Haight, in November Term 1865, Chief Justice Beasley delivering the opinion, the Supreme Court held the shares of stockholders in national banks were liable to state taxation, solely by virtue of the 41st section of the Act of Congress. The cases of Wright *v.* Stilz, in the state of Indiana; of Frazer *v.* S. W. Siebern, in Ohio, are to be found in the American Law Register, vol. 6, N. S. No. 8, for June 1867, pages 471, &c., with a learned note on these and other cases cited in it by one of the editors. On the 24th July 1867, the Supreme Court of Massachusetts decided shares of shareholders in national banks are subject to state taxation, conforming to the provisions of the 41st section above mentioned, and they cite a decision of the Supreme Court of New Hampshire and an opinion given to the legislature of the state of Maine by the justices of the Supreme Court, giving a different interpretation of the proviso from theirs.

There is also a Nisi Prius decision of our brother Agnew in Markoe *v.* Hartranft, published in the same volume of the American Law Register, p. 487, holding that the shares of stockholders in national banks can only be taxed by a state in strict conformity with the provisions of the National Bank Act of June 1864.

This is a very large and important question in all its bearings, involving over sixteen hundred national banks, with a national currency of three hundred millions, which, if exposed to unlimited state taxation, might be taxed out of existence, and the financial system of the government entirely destroyed. All the authorities, state and national, agree in holding a tax like the present one to be unconstitutional.

Judgment affirmed.

THOMPSON, J., dissented.