City of Pittsburgh, a municipal corporation, and Joseph L. Cosetti, Treasurer *v.* Allegheny Valley Bank of Pittsburgh et al., Appellants.

City of Pittsburgh, a municipal corporation, and Joseph L. Cosetti, Treasurer *v.* Allegheny Valley Bank of Pittsburgh et al. Pittsburgh National Bank, Appellant.

City of Pittsburgh, a municipal corporation, and Joseph L. Cosetti, Treasurer, Appellants *v.* Allegheny Valley Bank of Pittsburgh et al., Appellees.

Argued November 2, 1977, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., ROGERS and BLATT.

*Eugene B. Strassburger, III,* Deputy City Solicitor, with him *Grace S. Harris,* Executive Assistant City Solicitor, and *Mead J. Mulvihill, Jr.,* City Solicitor, for appellants.

*Carl E. Glock, Jr.,* with him *J. Sherman McLaughlin; Reed, Smith, Shaw & McClay; George L. Cass; Buchanan, Ingersoll, Rodewald, Kyle & Buerger; Everett K. Dilworth; John P. Papuga; Tucker, Arensberg & Ferguson; James F. Malone, III; Brandt, Milnes, Rea & Malone; Robert H. Stevenson; Anderson, Moreland & Bush; Abraham Fishkin; William B. Mallin; Ray C. Stoner;* and *Eckert, Seamans Cherin & Mellott,* for appellees.

OPINION BY PRESIDENT JUDGE BOWMAN, May 30, 1978:

These consolidated cross appeals[1] evolve from litigation initiated by the City of Pittsburgh in the Court of Common Pleas of Allegheny County to enforce collection of its Business Privilege Tax[2] assertedly due and owing by nine banking institutions (banks), State and Federal, for the tax years 1969-73.

There is no dispute that the taxing ordinance as enacted reaches banks and would impose the tax upon them for the privilege of doing business in Pittsburgh, said tax measured by the gross receipts of banks as defined in the ordinance and supporting regulations. Rather, the banks have consistently denied liability for the tax on the theory that State law precludes the City from imposing the tax on banks, and, as to several tax years involved, the Federal banks argue that Federal legislation is also a bar to taxing them.

---

[1] The City of Pittsburgh is appellant at No. 270 C.D. 1977. Allegheny Valley Bank of Pittsburgh, Commercial Bank and Trust Company, Iron and Glass Bank, Keystone Bank, North Side Deposit Bank —State banks—Mellon Bank, N.A., Pittsburgh National Bank, The Union National Bank of Pittsburgh and Equibank, N.A.—national banks—are appellants at Nos. 293, 294 and 295 C.D. 1977.

[2] Enacted by the City of Pittsburgh Ordinance No. 675 of 1968, effective January 1, 1969, as amended by Ordinance No. 594 of 1970, which amendments are not germane to the issues in these cross appeals.

In the lower court, the banks were successful except as to gross receipts derived by them from "nontraditional" banking activities which were held to be subject to the City's tax. Hence, these cross appeals in which the City insists that neither State nor Federal law precludes imposition of its gross receipts business privilege tax upon banks, while the banks argue that there can be no distinction between traditional and nontraditional banking activities for tax purposes as all such activities are conducted and carried on with the approval of the Secretary of Banking, who enjoys the exclusive power and authority to supervise and regulate banks in the conduct of their business.

The first issue requires consideration of the provisions of a State statute imposing a State tax upon banks and the provisions of the State statute by the authority of which the City has enacted this taxing ordinance.

## THE BANK SHARES TAX (SHARES TAX)[3]

Section 701 of the Tax Reform Code of 1971, 72 P.S. §7701, and its predecessor legislation impose an annual State tax upon the actual value of the capital stock of banks incorporated in or located within the Commonwealth. It is imposed at the rate of fifteen mills[4] upon the actual value of each share of stock to be "ascertained and fixed by adding together the amount of capital stock paid in, the surplus, and undivided profits, and dividing this amount by the number of shares."

---

[3] The Bank Shares Tax is imposed by Section 701, Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §7701, which reenacted this tax previously imposed by the Act of July 15, 1897, P.L. 292, *as amended,* 72 P.S. §1931.

[4] The rate of tax had varied over the years under the predecessor legislation.

Of significance in these cross appeals, this same section further provides:

[S]o much of the capital and profits of such bank . . . as shall not be invested in real estate, shall be exempt from local taxation under the laws of this Commonwealth; and such bank . . . having capital stock shall not be required to make any report to the local assessor or county commissioners of its personal property owned by it in its own right for purposes of taxation and shall not be required to pay any tax thereon.

The lower court concluded that this language of the Shares Tax prohibited the City from imposing its Business Privilege Tax upon banking institutions measured by gross receipts as defined in the taxing ordinance applicable to banking institutions, reasoning that gross receipts as so defined makes the tax, in reality, as one on gross profits, not gross receipts, derived for the most part upon interest received from loans and investments. Having found the local tax to be essentially an income tax as applied to banks rather than a gross receipts tax, the lower court concluded that the above language exempted banks from the attempted imposition of the local tax.

There is no doubt that the legislative history of the predecessor legislation to the present Shares Tax and the decisional law interpreting exemption language contained therein support the conclusion reached by the lower court on this issue. In *Oil City v. Oil City Trust Co.*, 151 Pa. 454, 25 A. 124 (1892), in issue as to several of the tax years in question was whether banks subject to the then State Shares Tax which exempted them "from local taxation under the laws of this commonwealth" could be subjected to a local ordinance imposing a $50.00 license fee for general revenue purposes. The Supreme Court concluded that this exemp-

tion language—also contained in the present Shares Tax—prohibited local governments from imposing a revenue-producing measure regardless of its characterization as a license fee. Prior decisions involving somewhat different language but related issues had reached the same conclusion. *City of Pittsburgh v. First National Bank*, 55 Pa. 45 (1867); *Iron City Bank v. City of Pittsburgh*, 37 Pa. 340 (1861). Since *Oil City*, the Shares Tax has been amended and reenacted many times and most recently reenacted by the Tax Reform Code of 1971, thus lending weight and continued precedential vitality to the construction placed upon the exemption language in issue in *Oil City*, notwithstanding its obvious antiquity. Section 1922(4), Statutory Construction Act of 1972, 1 Pa. C.S. §1922 (4).

The City argues, however, that these decisions are without precedential value today because of more recent decisions which, in determining one's entitlement to an exclusion or exemption from local taxation, have placed controlling significance upon the character and nature of the local tax as compared to that of the State tax by which exclusion or exemption from local taxation is asserted. It acknowledges that the lower court recognized this rule but erred in concluding that the City's Business Privilege Tax, as applied to banks, is, in effect, a property tax upon their income because of the definition of gross receipts found in the ordinance and regulations as applied to banks. Supportive of this argument the City cites *F. J. Busse Co. v. Pittsburgh*, 443 Pa. 349, 279 A.2d 14 (1971), in which the Supreme Court declared this very tax to be one on the privilege of engaging in business in Pittsburgh as measured by gross receipts, thus constituting an excise tax on this privilege and not a property tax. As such, the City would have us conclude, being an excise tax on

the privilege of doing business, the lower court could not have properly concluded that as applied to banks the City's tax is, in effect, a tax on "profits" of the banks—a property tax, which is the intended prohibition from local taxation contained in the Shares Tax.

*F. J. Busse,* however, was not concerned with the prohibiting language found in the Shares Tax but rather that contained in The Local Tax Enabling Act[5] hereinafter discussed. Nor was it concerned with the City's Business Privilege Tax as directed against banking institutions. In declaring this tax to be an excise tax on the privilege of doing business as measured by gross receipts, the Supreme Court found it not to be prohibited by The Local Tax Enabling Act as duplicating pro tanto the Commonwealth's capital stock tax and foreign corporate franchise tax, neither of which by their own provisions speaks to local taxation.

We are not persuaded that *F. J. Busse* and other cases declaring as of controlling significance the differing nature and character of a State tax and the local tax negate the precedential weight of *Oil City* in this case, which addresses itself specifically to the very language prohibiting local taxation of banks as found in the Shares Tax today. As we read *Oil City,* if the local tax is one to raise revenue, it is interdicted by the prohibitory language of the Shares Tax regardless of the nature and character of the Shares Tax as opposed to the local tax.

---

[5] Act of December 31, 1965, P.L. 1257, *as amended,* 53 P.S. §6901 et seq., Section 3 of which, 53 P.S. §6903, pronounces it to be the intent of the legislature to confer upon political subdivisions the power to levy, assess and collect taxes upon any and all subjects of taxation subject to certain restrictions and limitations not here relevant "which the Commonwealth has power to tax but which it does not tax or license. . . ."

We would also add that the lower court's analysis of the City's tax on the gross receipts of banks as defined in the taxing ordinance and regulations as being the equivalent of an income tax and hence a property tax appears to be sound and consistent with the admonition of the Supreme Court in *F. J. Busse* that the operation and incidence of the local tax is controlling as against mere differences in terminology from time to time employed by the courts in describing taxes in various cases. If *Oil City* is no longer vital, we would, nevertheless, affirm the lower court on this point.

## THE LOCAL TAX ENABLING ACT (LTEA)[6]

This statute, under the authority of which the City's Business Privilege Tax was ordained, pronounces it to be the intent of the legislature to confer upon political subdivisions the power to levy, assess and collect taxes upon any and all subjects of taxation,[7] which the Commonwealth has power to tax "but which it does not tax or license." To a degree, this legislation blends into the first issue on appeal but also concerns us as an independent issue for the reason that the banks, as appellees, argue that this legislation standing alone prohibits the imposition of the City's tax upon them. It pervades the first issue because the City argues that this statute authorizes local taxation of *all subjects* of taxation, that the *F. J. Busse* holding must apply in this case because the subjects of the Shares Tax and the City's tax differ, hence the prohibition of local taxation if the same subject is taxed by the State does not apply. The essential premise of this syllogism, however, is not valid, this premise be-

---

[6] *See supra* note 5.

[7] Certain restrictions and limitations on this broad sweep of this power are contained in the statute, but they are not germane to this case.

ing that the LTEA has impliedly repealed the independent prohibitory language as to local taxation of banks which are subject to the Shares Tax. Reenacted in 1971 as part of the Tax Reform Code, the Shares Tax contains the same prohibitory language as found in prior enactments and as construed in *Oil City*. The LTEA was enacted in 1965 and remains the same today as to the want of taxing power in political subdivisions of subjects which the Commonwealth taxes or licenses. The comparative legislative history of these two statutes cannot produce an implied repealer as the City would have us conclude.

Hence, the question recurs as to whether the prohibitory language of this statute, standing alone, proscribes local taxation of banks. As an independent reason for concluding that banks as to their traditional banking activities are not subject to the City's tax, the lower court held that the assessment of banks to cover the cost of operation of the Department of Banking as mandated by the Department of Banking Code[8] constituted a license fee within the meaning of the LTEA prohibiting local taxation of those businesses or activities otherwise subject to a local tax which pay a State license fee. In doing so, it necessarily concluded that such assessments are license fees within the meaning of LTEA as articulated by the Supreme Court in its plurality decision in *Philadelphia Tax Review Board v. Smith, Kline and French Laboratories*, 437 Pa. 197, 262 A.2d 135 (1970).[9]

We affirm the lower court on this issue and believe it unnecessary to restate the supporting facts found in

---

[8] Act of May 15, 1933, P.L. 565, *as amended*, 71 P.S. §733-1 et seq.

[9] This case construes the Act of August 5, 1932, Ex. Sess., P.L. 45, *as amended*, 53 P.S. §15971 et seq., the so-called Sterling Act, which contains a statement of legislative intent and the same exclusion for local taxation as found in the LTEA.

the opinion of the lower court or to elaborate upon the reasoning of the lower court in so concluding.[10] There can be no question that the assessment imposed upon banks (and other financial institutions) and paid to the State for the total cost of operating the Department of Banking is intended to be and, in fact, is a revenue-raising measure. That the method and means by which this is accomplished is characterized as a system of assessment rather than the imposition of a license for which a fee is charged, does not change its essential nature and purpose.

## TAXATION OF "NONTRADITIONAL" BANKING ACTIVITIES

By way of cross appeal, the appellant banks put in issue the conclusions of the lower court that the banks as to their "nontraditional" banking activities are engaged in business not protected by the prohibitory language of either the Shares Tax or the LTEA, the gross receipts from which activities are subjected to the City's tax for the privilege of the banks engaging in such activities.

Specifically, the lower court held with respect to four items, the banks have so deviated from banking practice that, even assuming exemption from the Business Privilege Tax, these activities were taxable. These practices include selling merchandise at a lower than cost premium to attract new business; receipt of commissions upon sale of insurance; conducting a travel agency; and the sale of time or service of computers.

Dispositive in the lower court's reasoning was whether or not the particular activity sought to be taxed fit within popular notions of "banking busi-

---

[10] The opinion of the Court of Common Pleas of Allegheny County in this case is reported at 123 Pitt. L.J. 305 (1975).

ness'' and "nonbanking business," considering at the same time whether the activity is competitive with nonbanks.

We do not believe that the exemptions and exclusions contained within the Shares Tax or the LTEA are subject to a case-by-case examination of the practice engaged in insofar as that practice is authorized by the applicable banking law.

We are not dealing here with activities specifically denied to banks by either the Department of Banking Code, or the Banking Code of 1965.[11] Particularly, Section 315(e) of the Banking Code of 1965, 7 P.S. §315(e), grants to subject institutions "[a]ll powers incidental to the conduct of banking business;" and the official comment thereto considers this provision to "[cover] a wide range and variety of activities in which institutions engage as part of the conduct of their banking business [as well as] other activities in which institutions may engage in the future."

Jurisdiction and supervisory power over banking business is vested in the Department of Banking by Section 201 of the Department of Banking Code, 71 P.S. §733-201. This includes reviewing the accounts, records and affairs of the institutions, and, generally, their compliance with the law. Section 2002 of the Banking Code of 1965, 7 P.S. §2002. To facilitate in the exercise of this function, each institution is required by Section 403 of the Department of Banking Code, 71 P.S. §733-403, to furnish annually a complete report of its earnings setting forth in detail all items of income and expense.

It is the province of the Department, therefore, utilizing the broad and flexible criteria incorporated within the Banking Code, to determine what is, and

[11] Act of November 30, 1965, P.L. 847, *as amended*, 7 P.S. §101 et seq.

what is not, permissible banking business. Activity so permitted is, by definition, "banking business" within the meaning of the Banking Code.

By virtue of the fact that improper criteria were utilized in determining what is statutorily permissible banking business, we must reverse the lower court on this point and hold that activities permissible under the banking laws are nontaxable by the City.

ORDER

Now, May 30, 1978, the order of the lower court is affirmed as it relates to the appeal to No. 270 C.D. 1977. The order of the lower court is reversed as it relates to the appeals to Nos. 293, 294 and 295 C.D. 1977.

---

CONCURRING AND DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

With the exception of the majority's resolution of the "nontraditional banking activities" issue, I concur.

That a bank engages in an activity does not, ipso facto, render that activity a "banking function" protecting it from local taxation. Tax exemption in this instance is premised on the principle that a banking activity is either directly or incidentally related to the conduct of the banking business. *See* Section 315 of the Banking Code of 1965, 7 P.S. §315. I fail to find even an incidental relationship between the activities enumerated by the majority and the conduct of "banking business."

The majority rationalizes its decision by allowing that "[i]t is the province of the Department . . . to determine what is, and what is not, permissible banking business. Activity so permitted is, by definition,

'banking business' within the meaning of the Banking Code." There are, however, parameters to the exercise of the Department's discretion. Section 103 of the Banking Code, 7 P.S. §103, provides in relevant part:

(a) Purposes of the act—The General Assembly declares as its purposes in adopting this act to provide for:

. . . .

(vi) The opportunity for institutions subject to this act to . . . *promote the economic progress of Pennsylvania and the United States* and to improve and expand their services and facilities for those purposes.

. . . .

(viii) A delegation to the department of adequate rule-making power and administrative discretion, *subject to the provisions of this act and to the purposes stated in this subsection (a)* . . . . (Emphasis added.)

To permit banking institutions to enter into business ventures outside the traditional functions of the banking industry under the pretext that such ventures are incidental to the conduct of banking business will be destructive to the economic progress of this Commonwealth. Tax-paying competitors in the private sector with meager assets will not be able to compete against tax-exempt banking institutions with virtually boundless assets and eventually must be eliminated.

The Department violated the standards mandated by the Legislature governing the limits of its discretion by declaring the enumerated non-banking functions to be incidental to the conduct of banking business. We should not compound the error by granting carte blanche to the Department in deciding what is and what is not a banking function. In my judgment,

the Banking Department has overstepped its authority and committed a glaring abuse of discretion.[1]

---

[1] A decision of the Department of Banking or of the Banking Board will be sustained unless it is based upon facts or conclusions which are not adequately supported by the evidence, or it committed a clear abuse of discretion, or exceeded its power, or based its decision, conclusion or Order on an erroneous interpretation of the law. *Dauphin Deposit Trust Co. v. Myers*, 401 Pa. 230, 236, 164 A.2d 86, 90 (1960).