MISSISSIPPI STATE TAX COMMISSION *v.* BROWN.

(In Banc. February 19, 1940.)

[193 So. 794. No. 33932.]

484

(In Banc. April 15, 1940.)

[195 So. 465. No. 33932.]

**J. A. Lauderdale, Jr.,** Assistant Attorney-General, for appellant.

486

Flowers, Brown & Hester, of Jackson, for appellee.

**J. A. Lauderdale**, for appellant, on suggestion of error.

490

491

**Ethridge, J.,** delivered the opinion of the court.

The appellee owned several shares of capital stock in a national bank, and the State Tax Commission included the dividends received by him from such stock in assessing his income taxes under chapter 120, Laws of 1934. The appellee filed his bill in the Chancery Court of Hinds county for hearing upon the action of the State Tax Commission in making such assessment for income tax upon this capital stock, challenging the right and power of the State Tax Commission to do so, and setting forth the allegations upon which he sought relief. In his petition he alleged that the bank in which he held stock was a national bank, an instrumentality of the Federal Government, the capital, franchise and operations of which are not taxable by the state, except by consent of the Congress of the United States; and the only consent given by Congress to the several states to tax national banks is found in section 548 of title 12 of United States Code Annotated; that the state of Mississippi had elected to tax the shares of national banks according to their value, as provided in section 3138 of chapter 61, Code of 1930; and that all taxes due the state of Mississippi upon shares of the said bank in which the appellee owned shares for the preceding years had been duly assessed and paid to the state, and that therefore the share-holders of the bank cannot be required to pay anything further thereon, either income taxes or otherwise, since by electing to tax the said shares, as above shown, the state of Mississippi exhausted its right to tax the bank or its shares, or the income therefrom. And appellee prayed for general relief.

The Tax Commission, through the Attorney General, demurred to the petition or bill of the appellee, which demurrer was overruled by the Chancellor. Thereupon the Tax Commission filed an answer, admitting that the petitioner is a citizen and taxpayer of Hinds county, Mississippi, and that he prepared and filed, within the time

provided by law, his income tax returns to the state of Mississippi; but denied that said return set forth all income taxes due by him for the said year, and alleged that the petitioner or complainant, without authority of law, deducted from his gross income the sum of $2022, dividends received by him on shares of stock in a national bank, which he claimed were not subject to the tax; and denied that the petitioner had paid all the income tax due by him to the state of Mississippi, alleging that said sum so received as dividends constituted part of his net income subject to taxation under chapter 120, Laws of 1934.

The answer admitted that the bank was a national bank, and as such an instrumentality of the Federal Government, and that the bank was not taxable by the state, except under consent of Congress so to do. It averred that section 548, title 12 U. S. Code Ann., specifically authorized the state of Mississippi to levy an income tax on the net income of petitioner when the same is derived from shares owned by him in the said bank; admitted that the state levied ad valorem taxes on the shares according to their value; but averred that under subdivision (c) of section 548, title 12, U. S. Code Ann., the state was authorized to levy a tax on the net income of petitioner.

On the hearing the Chancery Court held that the appellee, the petitioner, was not subject to the tax on the income from the shares of said national bank, and found that the petitioner was improperly assessed therewith, and annulled such tax. From which judgment this appeal is prosecuted.

We are of the opinion that the Chancellor was correct in so holding. It was not the intention of the Legislature of 1934, in enacting chap. 120, Laws of 1934, to tax income derived from shares in national banks which had been taxed in accordance with the value of such shares, as provided by section 3138, Code of 1930, the state having elected to tax the shares of national banks as therein

provided, and not under the other methods proposed in Section 548, Title 12, U. S. Code Ann., Chapter 120, Laws of 1934, was a new enactment upon the subject of income taxes, repealing chapter 124, Code of 1930, and chapters 96 and 97, Laws of 1932. This act in directing the assessment, levy and collection of income taxes for each calendar year used the phrase ''taxable income,'' the basis of taxation being provided on ''the first $2,000.00 of taxable income or any part thereof, at the rate of two and one-half per centum;

''On the next $3,000.00 of taxable income or any part thereof, at the rate of three and one-half per centum;

''On the next $10,000.00 of taxable income, or any part thereof, at the rate of five per centum; on all taxable income in excess of $15,000.00 at the rate of six per centum.'' Section 3.

At the time of the enactment of this statute it was the settled law of the United States, as shown by a decision of the Supreme Court at that time, that Federal agencies could not be taxed by the states without the consent of Congress, and that the states were limited to the methods provided in the Federal statute, giving its consent to such assessment only to a limited extent, and on specified conditions. It must be presumed that the Legislature, in enacting the statute, had knowledge of the Federal law and of the court decisions construing it.

By clause 3 of article 6 of the United States Constitution, U. S. C. A., it is provided: ''The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.''

The requirement that the members of the several state legislatures, and all executive and judicial officers, both of the United States, and of the several states, shall be

bound by oath or affirmation to support the Constitution, imposes upon all those exercising the powers of any office the duty of supporting the Constitution, which carries with it the duty of careful examination of the Constitution, and of the construction placed upon it by the highest Court.

The Mississippi Constitution also requires members to take a special oath set forth in section 40 of the Constitution of 1890, which reads as follows: "Members of the legislature, before entering upon the discharge of their duties, shall take the following oath: 'I, ———, do solemnly swear (or affirm) that I will faithfully support the Constitution of the United States and of the state of Mississippi; that I am not disqualified from holding office by the Constitution of this state; that I will faithfully discharge my duties as a legislator; that I will, as soon as practicable hereafter, carefully read (or have read to me) the Constitution of this state, and will endeavor to note, and as a legislator to execute, all the requirements thereof imposed on the legislature; and I will not vote for any measure or person because of a promise of any other member of this legislature to vote for any measure or person, or as a means of influencing him or them so to do. So help me God.' "

It must be presumed, therefore, that every member of the legislature gave thought and study to the matter of his obligation to support the Constitution, and governed his actions in accordance with the requirements of the Federal Constitution as interpreted at that time by the highest judicial authority of the nation which has the final power of interpreting the Constitution, which interpretation is binding upon every officer of the Federal Government, and of the state government.

It is further provided in Clause 2 of Article VI of the Constitution of the United States U. S. C. A., that it is the supreme law of the land. It reads as follows: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties

made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

Turning to other parts of the Constitution, we find that the legislative power of the Federal Government, granted by the Constitution of the United States, is vested in the Congress of the United States, which shall consist of the Senate and House of Representatives; such powers being specified in clauses 1 to 18 of section VIII of article 1 of the Constitution, the 18th clause reading, "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

It is, therefore, the duty of the legislature, in passing state legislation, to conform to the Constitution of the United States, as then understood and interpreted by the highest judicial body vested with authority to construe it. The statute here involved must now be construed just as it would have been, had the controversy arisen shortly after the statute became effective; at which time, in the light of the then existing decisions of the United States Supreme Court, we would have been under duty to limit the broad language of the statute, wherever the language was general enough to include the tax here involved, so as to make it conform to the Federal law as interpreted by the highest court of the United States—which is the supreme law of the land.

It is a familiar rule of statutory construction, that if reasonably possible, statutes shall be construed to conform to constitutional requirements, and that broad language will be limited to conform to constitutional requirements. This was held in the case of New Orleans M. & C. R. Co. v. State, 110 Miss. 290, 70 So. 355, wherein the general language of privilege tax laws on railroads, levied by the Legislature of the state upon classification, was

limited to make the statute operative only with respect to intrastate commerce, and not with respect to interstate commerce. This rule is a principle of general statutory construction. See Black on Statutory Construction, page 103, where it is said: "In construing a doubtful or ambiguous statute, the courts will presume that it was the intention of the legislature to enact a valid, sensible, and just law, and one which should change the prior law no further than may be necessary to effectuate the specific purpose of the act in question. The construction should be in harmony with this assumption whenever possible. But presumptions of this kind cannot prevail against the clear and explicit terms of the law."

It is further said, on page 105 of the same book, "It is presumed that the legislature does not design any attempt to transcend the rightful limits of its authority, to violate the principles of international law, or to give extraterritorial effect to its statutes."

In Kennington v. Hemingway, 101 Miss. 259, 57 So. 809, 810, 39 L. R. A. (N. S.) 541, Ann. Cas. 1914B, 392, a statute required contracts and transactions between husband and wife to be reduced to writing and actually recorded on the public records of the county to make it valid; and the Court limited the broad language of the statute, holding that it did not apply to the gift by the husband to his wife of a diamond ring there involved. It was there held that the gift by a husband to his wife of clothing, etc., suitable to her station in life, is valid as against a third person, although such gift is not evidenced by a written instrument, acknowledged and recorded as provided by section 2522, Code 1906. It was also held that in the construction of statutes, courts chiefly desire to reach the real intention of the framers of the law, and knowing this to adopt that interpretation which will meet the real meaning of the legislature, though such interpretation may be beyond or within, wider or narrower than the mere letter of the enactment.

The language there construed was very broad, and provided that, "Transfer or conveyance of goods and chattels, or lands or any lease of lands, between husband and wife, shall not be valid as against any third person, unless the transfer or conveyance be in writing and acknowledged and filed for record as a mortgage or deed of trust is required to be; and possession of the property shall not be equivalent to filing the writing for record, but, to affect third persons, the writing must be filed for record."

In Black on Construction, etc., of Laws, supra, at page 110, it is said, "Every act of the legislature is presumed to be valid and constitutional until the contrary is shown. All doubts are resolved in favor of the validity of the act. If it is fairly and reasonably open to more than one construction, that construction will be adopted which will reconcile the statute with the constitution and avoid the consequence of unconstitutionality."

In Ascher & Baxter v. Edward Moyse & Co., 101 Miss. 36, 57 So. 299, in syllabus 8 it is said, "Courts in construing a statute will presume that the legislature in enacting the statute was familiar with its own enactments and with the construction which the courts had placed on those enactments." This same idea is also the basis for the well settled doctrine in this state, that where a statute has been construed by the highest court having authority to construe it, and afterwards re-enactment in the statute without change, that the legislature has adopted as a part of the construction placed upon it by the court's decision.

In Henry v. Henderson, 103 Miss. 48, 60 So. 33, in syllabus 3 it is said, "Where a statute has been construed by the highest court of a state and afterwards re-enacted in substantially the same terms, the legislature by such re-enactment adopts along with the statute such construction."

See, also, to the same effect Burks v. Moody, 141 Miss. 370. 378, 3rd syllabus, 106 So. 528, 107 So. 279; Womack

v. Central Lumber Co., 131 Miss. 201, 3rd syllabus, 94 So. 2. Also, 59 C. J., title "Statutes," section 625, Id., section 650; 12 C. J., title "Constitutional Law," section 220.

It is the duty of the Court to construe the acts of the legislature so as to uphold their constitutionality. Easterling Lumber Co. v. Pierce, 106 Miss. 672, 64 So. 461; Richards v. City Lumber Co., 101 Miss. 678, 57 So. 977; Natchez & S. R. Co. v. Crawford, 99 Miss. 697, 55 So. 596; State v. Louisville & N. R. Co., 97 Miss. 35, 51 So. 918, 53 So. 454, Ann. Cas. 1912C, 1150. In construing statutes, the Court should not attribute to the legislature a design to ignore constitutional limitation on their power to legislate. Of course, the legislature must be understood to have knowledge of the decisions existing at the time of their enactment and not be held to anticipate that the courts would afterwards change their decisions. Laws are presumed to be passed with deliberation, and with full knowledge of all existing laws on the subject, and it will be held reasonable to conclude that in passing a statute it was enacted with full knowledge of all such laws. Cumberland Telephone & Telegraph Co. v. State, 99 Miss. 1, 54 So. 446.

In 25 R. C. L., 959, section 215, under heading, "Meaning to be Given as of Time of Enactment," it is said, "There is always a tendency, it has been said, to construe statutes in the light in which they appear when the construction is given. It is easy to be wise after one sees the results of experience. The true rule is that statutes are to be construed as they were intended to be understood when they are passed;" citing United States v. Union Pac. R. Co., 91 U. S. 72, 23 L. Ed. 224; Schuyler County v. Thomas, 98 U. S. 169, 25 L. Ed. 88; Com. v. Erie & N. E. R. Co., 27 Pa. 339, 67 Am. Dec. 471; Platt v. Union P. R. Co., 99 U. S. 48, 63, 25 L. Ed. 424; Bloomer v. Todd, 3 Wash. T. 599, 19 P. 135, 1 L. R. A. 111; See, also, People v. Barnett, 319 Ill. 403, 150 N. E. 290; State v. Boston, etc., R. Co., 123 Me. 48, 121 A. 541.

Gray on Limitation on the Taxing Power, page 398, section 788, lays the rule down in regard to taxation of national banks, as follows: ''It is well established law that the present system of National Banks, as well as the old United States Banks, constitute Federal agencies, organized by Congress under its power to regulate currency (citing Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482; Farmers Bank v. Dearing, 91 U. S. 29, 23 L. Ed. 196; Davis v. Elmira Savings Bank, 161 U. S. [275] 283, 16 S. Ct. 502, 40 L. Ed. 700; Owensboro Nat. Bank v. Owensboro, 173 U. S. 664, 19 S. Ct. 537, 43 L. Ed. 850). Such agencies are exempt from state taxation, except in so far as Congress may have waived the exemption (McHenry v. Downer, 116 Cal. 20, 47 P. 779, 45 L. R. A. 737; Covington City Bank v. Covington, C. C., 21 F. [484] 489; Rich v. Packard Nat. Bank, 138 Mass. 527; Carthage v. First Nat. Bank, 71 Mo. 508, 36 Am. Rep. 494; Pittsburg v. First Nat. Bank, 55 Pa. 45). ''National banks are instrumentalities of the Federal government created for public purposes, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, whenever such attempted exercise of authority expressly conflicts with the laws of the United States and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties for the performance of which they were created. These principles were axiomatic and are sanctioned by the repeated adjudications of this court (Davis v. Elmira Savings Bank, 161 U. S. [275] 283, 16 S. Ct. 502, 40 L. Ed. 700). It follows then, necessarily, from these conclusions that the respective states would be wholly without power to levy, any tax, either direct or indirect, upon the national banks, their property, assets, or franchises, were it not for the permissive legislation of Congress. (Owensboro Bank v. Owensboro, supra.) ''

In Helvering v. Therrell, 303 U. S. 218-225, 58 S. Ct. 539, 82 L. Ed. 758, and other cases decided therewith, at the October term, 1937, it was said (2nd syllabus), "A state cannot tax appropriate means employed by the United States in the exercise of its delegated powers; and the United States cannot tax instrumentalities employed by a state in the discharge of its governmental duties." It was also held in the third syllabus that, "The exemption of state instrumentalities from Federal taxation does not extend to every instrumentality which a state may see fit to employ, but depends upon the nature of the undertaking."

In New York ex rel. Williams v. Weaver, 100 U. S. 539, 25 L. Ed. 705, it was held that the authority of a state to tax the shares of national banks is derived wholly from the act of Congress, and without the consent of Congress those shares cannot be taxed by the states. See, also, First Nat. Bank v. Albright, 208 U. S. 548, 28 S. Ct. 349, 52 L. Ed. 614.

In Mercantile National Bank v. City of New York, 121 U. S. 138, 7 S. Ct. 826, 30 L. Ed. 895, it was held that neither national banks, their capital, nor shares of stock then held by individuals are subject to taxation by the states wherein they are located, without the consent of Congress.

Thus, the law from 1819, when the Supreme Court, in the case of McCulloch v. Maryland, 4 Wheat. 316, 429, 4 L. Ed. 579, handed down an opinion written by Chief Justice Marshall, until 1938, maintained the doctrine in the Supreme Court of the United States that the states could not tax any instrumentlity of the Federal government without the consent of Congress.

The discussion in McCulloch v. Maryland, supra, was elaborate and lucid, and received the legal and judicial sanction of the country, as expressed by the majority of the courts. It would be interesting, if space permitted, to quote at length from this great original opinion by the greatest jurist in the history of the English speaking

people. I shall quote only a brief passage therefrom: "The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable, that it does not. Those powers are not given by the people of a single state. They are given by the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single state cannot confer a sovereignty which will extend over to them. If we measure the power of taxation residing in a state, by the extent of sovereignty which the people of a single state possess, and can confer on its government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a state unimpaired; which leaves to a state the command of all its resources, and which places beyond its reach, all those powers which are conferred by the people of the United States on the government of the Union, and all those means which are given for the purpose of carrying those powers into execution. We have a principle which is safe for the states, and safe for the Union. We are relieved, as we ought to be, from clashing sovereignty; from interfering powers; from a repugnancy between a right in one government to pull down, what there is an acknowledged right in another to build up; from the incompatibility of a right in one government to destroy, what there is a right in another to preserve. We are not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power. The attempt to use it on the means employed by the government of the Union, in pursuance of the constitution, is itself an abuse,

because it is the usurpation of a power which the people of a single estate cannot give. . . .

"But, waiving this theory for the present, let us resume the inquiry, whether this power can be exercised by the respective states, consistently with a fair construction of the constitution?

"That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied. But all inconsistencies are to be reconciled by the magic of the word confidence. Taxation, it is said, does not necessarily and unavoidably destroy. To carry it to the excess of destruction, would be an abuse, to presume which, would banish that confidence which is essential to all government.

"But is this a case of confidence? Would the people of any one state trust those of another with a power to control the most insignificant operations of their state government? We know they would not. Why, then, should we suppose, that the people of any one state should be willing to trust those of another with a power to control the operations of a government to which they have confided their most important and most valuable interests? In the legislature of the Union alone, are all represented. The legislature of the Union alone, therefore, can be trusted by the people with the power of controlling measures which concern all, in the confidence that it will not be abused. This, then, is not a case of confidence, and we must consider it is as it really is."

The Court held that the State of Maryland, therefore, could not tax the Bank of the United States, which was an instrumentality or agency of the national government, for the exercise of its delegated power.

Subsequently, in 1824, the case of Osborn et al. v. President and Directors of the Bank of the United States, 9 Wheat. 738, 22 U. S. 738, 739, 740, 6 L. Ed. 204, was brought before the Federal Supreme Court, which was asked to re-examined the doctrine announced in McCulloch v. Maryland, supra; this it did, reaffirming the doctrine there announced. The suit of Osborn v. Bank of the United States, supra, was brought to recover from the bank's directors money paid to the state of Ohio as taxes on the bank. The Court adhered to its former ruling, stating in the syllabus, "A state cannot tax the Bank of the United States; and any attempt, on the part of its agents and officers, to enforce the collection of such tax against the property of the bank, may be restrained by injunction from the circuit court."

The act creating the Bank of the United States was subsequently repealed by Congress, but many cases involving the supremacy of Congress in controlling and protecting the powers delegated to it, and upholding its rights, as against the rights of the states were decided. It is impossible to set forth all of the various decisions because of the length of this opinion. But subsequently the United States created National Banks for the purpose of exercising its money powers, and because an agency was needed through which its affairs could be efficiently conducted.

In Farmers & Merchants Nat. Bank v. Dearing, 91 U. S. 29, 23 L. Ed. 196, decided in 1875, it was held: "The States can exercise no control over national banks, nor in anywise affect their operation, except insofar as Congress may see proper to permit." In the course of its opinion in this case the Court said: "The principle announced in the authorities cited is indispensable to the efficiency, the independence, and indeed to the beneficial existence, of the General Government; otherwise it would be liable, in the discharge of its most important trusts, to be annoyed and thwarted by the will or caprice of every State in the Union. Infinite confusion would

follow. The government would be reduced to a pitiable condition of weakness. The form might remain, but the vital essence would have departed. In the complex system of polity which obtains in this country, the powers of government may be divided into four classes:—Those which belong exclusively to the States; Those which belong exclusively to the National Government; Those which may be exercised concurently and independently by both; And those which may be exercised by the States, but only with the consent, express or implied, of Congress.

"Whenever the will of the nation intervenes exclusively in this class of cases, the authority of the State retires and lies in abeyance until a proper occasion for its exercise shall recur. Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96; Ex parte McNeil, 13 Wall. 240, 20 L. Ed. 625. The power of the States to tax the existing national banks lies within the category last mentioned."

The Congress gave limited consent to the taxation of National Banks, prescribing the conditions under which such banks could be taxed by the states. Numerous decisions support the doctrines announced in the last quoted decision; and the law applicable thereto has continued in effect at least until the year 1938—if not until the present time, which we think it does.

In Gillespie v. Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338, it was held, "A state may not impose a tax upon the net income derived by a lessee of restricted Creek and Osage Indian lands from sales of his share of oil and gas received under his leases." This case was decided in 1922, at the October term of the Court.

In Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S. Ct. 443, 76 L. Ed. 815, it was held that, "The United States can lay no tax on instrumentalities of state government."

In Union Bank & Trust Co. v. Phelps, 288 U. S. 181, 53 S. Ct. 321, 322, 77 L. Ed. 687, 83 A. L. R. 1438, the

506

Court in its opinion, said, ''The several states lacked power to tax national bank shares, except as expressly permitted by Congress. Owensboro Nat. Bank v. Owensboro, 173 U. S. 664, 668, 19 S. Ct. 537, 43 L. Ed. 850; Des Moines Nat. Bank v. Fairweather, 263 U. S. 103, 106, 44 S. Ct. 23, 68 L. Ed. 191, [195]; First Nat. Bank v. Anderson, 269 U. S. 341, 347, 46 S. Ct. 135, 70 L. Ed. 295.

''This is enough to negative the idea that shares of national and state banks are essentially the same for purposes of taxation. And the Alabama Supreme Court has held that under her Constitution although the Legislature may have included them in the same class of taxable objects, there is permissible distinction between them. To accept the doctrine that as the states can only tax a federal instrumentality when permitted by Congress, therefore they cannot tax competitors of such instrumentalities within their general jurisdiction in some other fashion without violating the Fourteenth Amendment, would be both illogical and destructive of their proper independence. Such instrumentalities are exempted from state taxation without the express consent of Congress, by the Federal Constitution. They are of a class wholly distinct from the property of ordinary corporations or individuals, and this fact cannot be disregarded by the state.''

In Oklahoma ex rel. Oklahoma Tax Comm. v. Barnsdall Refineries, 296 U. S. 521, 56 S. Ct. 340, 80 L. Ed. 366, it was held that, ''A tax levied by the state of Oklahoma on each barrel of oil produced in the state and used to defray the expenses of administering the state Oil and Gas Proration Law is not within the consent given by Act of Congress of March 3, 1921, authorizing the state of Oklahoma to levy a tax upon the gross production of oil by lessees of lands of the Osage tribe of Indians in Osage County, with the proviso that all taxes so collected shall be in lieu of all other state and county taxes levied upon the production of oil and gas as provided by the laws of Oklahoma, where such statute was enacted in

contemplation of the then existing production tax which was distributable in part to the counties and thus would be of benefit to the Indian owners of lands in Osage County."

In the case of New York ex rel. Rogers v. Graves, 299 U. S. 401, 57 S. Ct. 269, 81 L. Ed. 306, it was held that the Federal government may use a corporation as a means to carry into effect substantive powers granted by the Constitution; and that such corporation was immune from state taxation; and also that where a corporation is immune from state taxation as an instrumentality of the Federal government, fixed salaries and compensation paid to its officers and employees in their capacity as such are likewise immune. This decision was rendered at the October, 1936, term of the Supreme Court of the United States; and shows that up to that time, at least, states could not tax instrumentalities of the Federal government, except with the consent of Congress, and on conditions and to the extent prescribed by Congress.

All the decided law, therefore, at the time of the enactment of the statute here involved was to the effect that Federal instrumentalities were not taxed, and could not be taxed without the consent of Congress. And we must assume that the legislature enacted the statute here involved in the light of these decisions, and intended to conform to them; and its action must be interpreted in the light of these decisions.

The Legislature cannot be held to foresee that the Court would change its decisions, and legislative acts cannot be rightfully interpreted in the light of decisions rendered after the enactment of the statute.

The Sixteenth Amendment to the Federal Constitution, U. S. C. A., enlarged the power of Congress to levy income taxes without apportionment among the several states, and without regard to enumeration; but it did not confer upon the states any power, and their power remains as it existed prior to the Sixteenth Amendment.

We have gone elaborately into the decisions of the Supreme Court of the United States upon the subject involved, largely because of difference of opinion among the Judges of this Court. The conclusion reached is that the Legislature did not intend to tax income upon shares of national banks; and although this decision is reached by an equally divided Court, under the Mississippi law it is the decision of the Court. Robertson, State Revenue Agent v. Mississippi Valley Co., 120 Miss. 159, 81 So. 799, 801. In fact, the result of the decision in such case is concurred in by four judges, one of whom is the trial judge, who is charged with the duty of deciding a controversy originally, and whose opinion, when approved by half of the Judges of the Supreme Court, becomes the law, founded on sound reason and public necessity. The Supreme Court is composed of six Judges, and it will sometimes happen there is an equal division of opinion between the Judges in regard to the correctness of the holding of the trial court. It was said in the case of Robertson, State Revenue Agent v. Mississippi Valley Co., supra, in announcing the position of the Court in making such a decision an affirmative settlement of the law in the case, "Such a division of the court is liable to occur at any time; and there are so many cases in which, by reason of interest, consanguinity, or former connection with the controversy, some one judge is disqualified from sitting, that there would be constant liability to an equal division if the court consisted of an unequal number. If, therefore, a decision made may be disregarded by a circuit judge because not made by a majority, we have and can have no settled law for the state at large, and each circuit judge will determine for himself conclusively what shall be the law for his circuit, and may make it different from the law of the adjoining court. This would so much resemble a judicial scandal that I should deem it my duty to prevent it by yielding my own opinion when the same question should come up again, if yielding should be essential to prevent such a conse-

quence. The notion that there can be anything improper or opposed to good morals in a judge yielding his opinion when a proper administration of justice requires it is one I do not quite understand. Judges are certainly doing that every day; it would be a great mistake to assume that every judgment in which a court unites expressed in all respects the views of every concurring judge.''

It must, therefore, of necessity be recognized that the decision of the court below, when approved by an affirmance, even by an equally divided court, had received the judicial judgment of four judges, all of whom are equally charged with the duty of administering the law in accordance with the Constitution. Such an opinion, then, may be written by the affirming Judges as supports the conclusion reached, which thereafter should be followed as a precedent, regardless of personal opinion. It frequently happens that personal and judicial opinion diverge, and sometimes lie far apart. But a judge should follow the judicial path, and act upon judicial opinion when the law has been settled. Often a judge of the appellate court would decide a case differently from his predecessors, were it a matter of original decision. There should be stability in the law; and if every judge followed his personal opinion, rather than the judicial opinion of his associates and predecessors, there would be no such thing as a settled rule. The public could not safely rely upon the advice of counsel, who must form his opinion upon the decisions of the Court. This Court has given protection to citizens from the effect of overruling cases, holding that transactions had or done under a construction making the act valid at the time it was done continue legal, although afterwards a change of decision was made by the Court. See Wisconsin Lumber Co. v. State, 97 Miss. 571, 54 So. 247; State v. Longino et al., 109 Miss. 125, 67 So. 902, Ann. Cas. 1916E, 371.

A majority of the Court are of the opinion that section 548, title 12 U. S. Code Ann., does not permit the

State to levy an income tax upon the dividends from shares of stock in national banks, because the state had elected to tax the shares of national banks on their value to the owners of such shares, as provided in the first division of said act of Congress; and that if such act of Congress was valid, the state was without power to impose an income tax upon such shares, as a part of his income tax.

Three of the Judges are of opinion that Congress was without power, under the Constitution, to forbid the state to levy an income tax upon the owners of such shares; that such power exists in the state, free from congressional control.

It is a serious thing to undertake to overturn a statute of the United States, passed by the Congress and approved by the President; and while it may be possible for Judges to so hold, we do not have the final decision in such questions. We think it unnecessary to go into a discussion of the constitutional power of the Congress to enact the statute here involved, but in view of the decisions already cited, which have not been overruled, so far as the taxation of national banks is concerned, we think we could not hold the act unconstitutional. That question should be reserved until it becomes absolutely necessary to so decide. Every reasonable doubt in regard to the constitutionality of the statute should be resolved in its favor.

It follows from these views that the judgment of the court below is affirmed.

Affirmed.

### DISSENTING OPINION.

**Smith, C. J.,** delivered a dissenting opinion.

As will hereinafter appear, I am in accord with much that is said in the opinion of my Brother ETHRIDGE.

The record presents three questions:

1. Does Chapter 120, Laws 1934, require dividends on shares of stock in a national bank to be included in an

assessment of the owner's income for taxation? Should that question be answered in the affirmative, then.

2. Does Section 548, Tit. 12 U. S. C. A., permit this to be done? Should that question be answered in the negative, then

3. Is the permission of Congress necessary to enable a state to include dividends on shares of stock in a national bank in the assessment of the owner's income for taxation?

Ordinarily, these questions should be discussed in the order in which I have stated them, but, for convenience, the first will be discussed last.

First. Section 548, Tit. 12 U. S. C. A., not only does not permit, but forbids, the inclusion of dividends on shares in a national bank by the State of Mississippi in the taxable income of the owner.

This statute assumes, which assumption had at the time of its enactment a qualified approval by the courts (Graves v. People of State of New York ex rel. O'Keefe, 306 U. S. 466, 59 S. Ct. 595, 83 L. Ed. 927, 120 A. L. R. 1466), that a tax on income is a tax on the source from which the income is derived. It provides:

"The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may (1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, provided the following conditions are complied with:

"1. (a) The imposition by any State of any one of the above four forms of taxation shall be in lieu of the others, except as hereinafter provided in subdivision (c) of this clause."

Mississippi taxes national and state banks on the shares of their stock, Section 3138, Code 1930, and cannot, there-

fore, under Section 548, Tit. 12 U. S. C. A., include dividends derived from their stock in the taxable income of an owner or holder thereof, unless permission so to do is given in subdivision (c) of Clause I of the statute, which reads as follows: "(c) In case of a tax on or according to or measured by the net income of an association, the taxing State may, except in case of a tax on net income, include the entire net income received from all sources, but the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing State upon mercantile, manufacturing, and business corporations doing business within its limits: Provided, however, That a State which imposes a tax on or according to or measured by the net income of, or a franchise or excise tax on, financial, mercantile, manufacturing, and business corporations organized under its own laws or laws of other States and also imposes a tax upon the income of individuals, may include in such individual income dividends from national banking associations located within the State on condition that it also includes dividends from domestic corporations and may likewise include dividends from national banking associations located without the State on condition that it also includes dividends from foreign corporations, but at no higher rate than is imposed on dividends from such other corporations."

This subdivision of the statute does two things: (1) prohibits discrimination in taxation against national banks in favor of other financial, mercantile, manufacturing and business corporations; and (2) permits states taxing national banks in one of the ways provided by the preceding first paragraph of the section to include also, within the prescribed limitations, dividends from the shares of stock thereof in the taxable income of the owners.

Clause 1, in all of its provisions, seems to deal only with what a state can do when taxing national banks

by the third and fourth method permitted by the first paragraph of the section, i. e., tax such associations on their net income, or according to or measured by their net income. When national banks are taxed, the proviso permits the state to include dividends from shares of their stock to be included in the taxable income of the owners thereof, provided the same course is pursued as to other corporations and their shareholders.

As hereinbefore stated, Mississippi (Chap. 120, Laws 1934) taxes national banks according to the first method provided by the statute, i. e., on their shares of stock, so that the proviso of subdivision (c) of Clause 1 seems not to here apply. But if it be said that the proviso applies also to the first method of taxing national banks provided by the statute, i. e., on their capital stock (it could not, of course, apply to the second method there provided, that is, include dividends from national bank stock in the taxable income of the owner thereof), the same result would be reached.

In order for a state which taxes national banks in one of four ways provided by the federal statute to include also dividends from their shares of stock in the taxable income of the owners thereof, three things must concur: (1) The state must impose "a tax on or according to or measured by the net income of, or a franchise or excise tax on, financial, mercantile, manufacturing, and business corporations organized under its own laws or laws of other States;" (2) must impose a tax on the income of individuals; and (3) include therein "dividends from domestic corporations," etc.

Chapter 120, Laws 1934, imposes an income tax on corporations, but does not include dividends from their shares of stock in the taxable income of the owners thereof. It is true that the statute includes dividends from national and state bank stocks in the taxable income of the owner thereof, but no income tax is imposed on the banks themselves; consequently the three conditions of

the proviso of subdivision (c) of Clause 1 are not met thereby.

Second. The permission of Congress is not necessary to enable a state to include dividends from shares of stock in a national bank in the owner's taxable income. Nor has Congress the constitutional power to forbid a state to so do. That a tax on income is a tax on the source from which the income is derived had the qualified approval of the Supreme Court of the United States when this statute was enacted, but has since been unqualifiedly disapproved by that Court. Graves v. People of State of New York, ex rel. O'Keefe, supra, and authorities there cited, which accords with State ex rel. Knox v. Gulf, M. & O. R. Co., 138 Miss. 70, 104 So. 689, and Compress of Union v. Stone, Chairman, State Tax Commission, Miss., 193 So. 329, recently decided by this Court but not yet reported.

The tax here under consideration being, therefore, not a tax on a national bank, or on its shares of stock, its imposition is for the determination of the state alone; and the fact that the income is derived from the shares of a national bank confers on Congress no power to interfere therewith.

Third. Section 3, Chapter 120, Laws 1934, imposes an income tax "upon the entire net income of every resident individual, corporation, association, trust or estate".

Section 14 of the statute exempts from the tax certain designated organizations, including national banks and state banks.

"The term net income means the gross income as defined hereunder, less the deductions allowed". Sec. 6, Chap. 120, Laws 1934. Gross Income "includes . . . dividends . . . of any business carried on for gain or profit . . . , and incomes derived from any source whatever". Sec. 7, Chap. 120, Laws 1934. It does not include "Income received during the taxable year as dividends from a corporation on which such corporation has already paid or is liable by assessment to

pay an income tax." Sec. 7, par. (b) (8), Chap. 120, Laws 1934.

It thus appears that national and state banks are not taxed on their income, and, consequently, dividends on their shares of stock are to be included in the income of the owner thereof. Any doubt as to this disappears when the statute is examined in connection with its predecessor, Chap. 124, Code 1930. Paragraph (b) (8) of Section 5033 of that chapter provides that the term "gross income" does not include "Income received during the taxable year as dividends from a corporation on which such corporation has already paid or is liable by assessment to pay an income tax, or *dividends from a national bank or state bank organized under the laws of the state of Mississippi."* (Italics supplied.) When the statute was re-enacted as Chapter 120, Laws 1934, this paragraph of Section 5033 of the Code became paragraph (b) (8) of Section 7 of Chapter 120, Laws 1934, and was amended by eliminating therefrom the words "or dividends from a national bank or state bank organized under the laws of the state of Mississippi".

But it is said that the Legislature knowing when the statute was enacted that the Supreme Court of the United States was then holding that a tax on income was a tax on the property from which it was derived, and interpreting Title 12, Sec. 548, U. S. C. A., to prohibit it from including dividends from shares in a national bank in the taxable income of the owner thereof, did not intend by Chapter 120, Laws 1934, to include such dividends in the taxable income of the owners of such shares.

I do not know what the Legislature here had in mind, except as disclosed by the words of the statute. My guess, which is all that anyone can venture, would be that it construed Tit. 12, Sec. 548, U. S. C. A., to permit the imposition of the tax, and acted accordingly.

The language of Chap. 120, Laws 1934, is plain and unambiguous. Income from state banks and national banks are dealt with together, by the same words in the

same sentences, not separately. What the statute directs as to one, it directs also as to the other. And I know of no rule of construction which would permit the Court to hold that the statute was intended to apply to one and not the other—that it was intended to apply to income from shares in state banks but not to income from shares in national banks.

The State Tax Commission committed no error, in my opinion, in including dividends from the appellee's shares in a national bank in his taxable income, and the court below should have dismissed his petition seeking the annulment of this act of the Commission.

**Griffith** and **Anderson, JJ.**, concur in this opinion.

**Per Curiam.**—A suggestion of error has been filed in this case to the effect that we erred in the opinion heretofore rendered. We might safely stand upon the opinion heretofore rendered, for the authorities therein cited show that until the year 1938 the United States Supreme Court had held that states were without power to tax the instrumentalities of the Government of the United States, either directly or indirectly.

It is said in the suggestion of error that the cases we cited were not income tax cases; but in the case of People ex rel. Rogers v. Mark Graves et al., 299 U. S. 401-409, 57 S. Ct. 269, 81 L. Ed. 306, it was held that the state of New York was not authorized to levy an income tax on the salary of the president of the Panama Railroad, and other employes of that company, which was entirely owned by the Government of the United States, and operated as its instrumentality. In the second syllabus it is said: ''The operations of the Panama Railroad Company, of the capital stock of which the United States is the sole owner, are so connected with the Panama Canal as to confer upon the railroad company the immunity of a Federal instrumentality from 'state taxation, even though the railroad company to a limited extent utilizes

its ships and railroad to carry private freight and passengers, and though it also operates in the Canal Zone a dairy, hotels, and a commissary for the benefit of the personnel of the Canal, the railroad company, and the armed forces of the United States in the Zone.''

It is also held in the third syllabus: ''The Federal government may use a corporation as a means to carry into effect substantive powers granted by the Constitution.'' And in the fourth syllabus it is held: ''Where a corporation is immune from state taxation as an instrumentality of the Federal government, fixed salaries and compensation paid to its officers and employees in their capacity as such are likewise immune.'' And in the fifth syllabus it is said: ''The general counsel, employed on a fixed salary, of a corporation which is a Federal instrumentality, is an employee of the corporation rather than an independent contractor, as respects the liability of his salary to state taxation.''

This decision was rendered at the October term, 1936, of the United States Supreme Court, which was more than two years after the enactment of the statute involved in this suit.

In the case of Fred Miller v. City of Milwaukee, 272 U. S. 713, 47 S. Ct. 280, 71 L. Ed. 487, it was held that where income of a corporation which becomes the basis of dividends is derived from bonds of the United States government, a state cannot lay an income tax upon the dividends in the hands of stock-holders so far as they represent the income of such bonds. This case was decided at the October term, 1926, of the United States Supreme Court.

Until the decision in the case of Mark Graves et al. v. People ex rel. O'Keefe, 306 U. S. 466, 59 S. Ct. 595, 83 L. Ed. 927, 120 A. L. R. 1466, it is clear that the Federal law was that Federal instrumentalities were not subject to state taxation, either directly or indirectly, and that the consent of Congress was necessary before the states could tax such instrumentalities, either di-

rectly or indirectly. Some confusion and uncertainty, however, had been shown in the decisions of the Federal Supreme Court, in regard to the theory of whether or not the instrumentalities were engaged in a governmental function, or in a private function; and that where engaged in a private, rather than a governmental function, the state might tax it. Until 1936, when at the October term of the Supreme Court it was held, in the case of Brush v. Commissioner of Internal Revenue, 300 U. S. 352-378, 57 S. Ct. 495, 81 L. Ed. 691, 108 A. L. R. 1428, that salaries and compensation paid the municipal officers and employes, engaged in the performance of the city's governmental functions, are immune from Federal taxation, under the principle that neither a state nor a Federal government may levy a tax which will burden the activities of the other. This was held, although the city charged for the use of its facilities, exercised through the commissioners; and it was urged that, being so engaged in furnishing private customers for a price charged, such salaries were subject to taxation by the government. At page 372 of 300 U. S., 57 S. Ct. at page 501, 81 L. Ed. 700, 108 A. L. R. 1428, the Court replied to this contention, saying:

"Respondent contends that the municipality, in supplying water to its inhabitants, is engaged in selling water for profit; and seems to think that this, if true, stamps the operation as private and not governmental in character. We first pause to observe that the overhead due to the enormous cost of the system, and the fact that so large a proportion of the water is diverted for public use, rather plainly suggests that no real profit is likely to result. And to say that, because the city makes a charge for furnishing water to private consumers, it follows that the operation of the water works is corporate and not governmental, is to beg the question. What the city is engaged in doing in that respect is rather rendering a service than selling a commodity. If that service be governmental, it does not become private because a

charge is made for it, or a profit realized. A state, for example, constructs and operates a highway. It may, if it chooses, exact compensation for its use from those who travel over it (see Bingaman v. Golden Eagle Western Lines, 297 U. S. 626, 628, 56 S. Ct. 624, 80 L. Ed. 928 [930]); but this does not destroy the claim that the maintenance of the highway is a public and governmental function. . . . The contention is made that our decisions in South Carolina v. United States, 199 U. S. 437, 461, 462, 26 S. Ct. 110, 50 L. Ed. 261 [269, 270], 4 Ann. Cas. 737, and Flint v. Stone Tracy Co., 220 U. S. 107, 172, 31 S. Ct. 342, 55 L. Ed. 389 [421], Ann. Cas. 1912B, 1312, are to the effect that the supplying of water is not a governmental function; but in neither case was that question in issue, and what was said by the court was wholly unnecessary to the disposition of the cases and merely by way of illustration.''

Hence, in 1936 it was held that the fact that a corporation which was a governmental agency or instrumentality, also engaged in business for profit incident to its governmental function, does not destroy its immunity from state taxation.

In Indian Motorcycle Co. v. United States, 283 U. S. 570, 51 S. Ct. 601, 75 L. Ed. 1277, it as held: ''The instrumentalities, means, and operations whereby the United States exercises its governmental powers are exempt from taxation by the states, and the instrumentalities, means, and operations whereby the states exert the governmental powers belonging to them are exempt from taxation by the United States, by virtue of the principle implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system.''

It was also held in the sixth syllabus: ''Where the principal of exemption of Federal instrumentalities from state taxation and of state instrumentalities from Federal taxation applies, it is not affected by the amount of

the particular tax or the extent of the resulting inter-
ference, but is absolute."

It was held in the seventh syllabus that: "A sale of
motorcycles to a state agency, such as a municipal cor-
poration, for use in its police service, is exempt from the
excise tax imposed by section 600 of the Revenue Act
of 1924, chap. 234, 43 Stat. at L. 322 [26 U. S. C. A. Int.
Rev. Acts], on sales of motorcycles by the manufacturer."
This decision was rendered at the October term, 1930,
of the Supreme Court of the United States.

The immunity was that of state agencies from Federal
taxation; immunity of Federal agencies from state tax-
ation has existed practically from the beginning of the
government, and the sales of government officials were
held not subject to taxation by states in 1842, almost
a century ago, when the cause of Dobbins v. Commis-
sioners of Erie Co., 16 Pet. 435, 449, 10 L. Ed. 1022 was
decided. In the course of the opinion in that case the
Court said:

"The powers of the national government can only
be executed by officers whose services must be compen-
sated by Congress. The allowance is in its discretion.
The presumption is that the compensation given by law
is no more than the services are worth, and only such in
amount as will secure from the officer the diligent per-
formances of his duties. 'The officers execute their
offices for the public good. This implies their right of
reaping from thence the recompense the services they
may render may deserve,' without that recompense being
in any way lessened, except by the sovereign power from
whom the officer derives his appointment, or by another
sovereign power to whom the first has delegated the
right of taxation over all the objects of taxation, in com-
mon with itself, for the benefit of both. And no diminu-
tion in the recompense of an officer is just and lawful,
unless it be prospective, or by way of taxation by the
sovereignty who has a power to impose it, and which is
intended to bear equally upon all according to their es-

tate. The compensation of an officer of the United States is fixed by a law made by Congress. It is in its conclusive discretion to determine what shall be given. It exercises the discretion and fixes the amount, and confers upon the officer the right to receive it when it has been earned. Does not a tax, then, by a State upon the office, diminishing the recompense, conflict with the law of the United States, which secures it to the officer in its entireness? It certainly has such an effect; and any law of a State imposing such a tax cannot be constitutional, because it conflicts with a law of Congress made in pursuance of the Constitution, and which makes it the supreme law of the land." In the case notes in the Law Edition are found other cases holding to the same effect.

In the case of Chas. E. Smith v. Kansas City Title & T. Co., 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577, it was held that: "The creation of Federal land banks and joint stock land banks by the Federal Farm Loan Act of July 17, 1916, as amended by the Act of January 18, 1918 [12 U. S. C. A. sec. 991], and the grant of authority to them to act for the government as depositaries of public moneys and purchasers of government bonds, brings them within the creative power of Congress although they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest."

It was also held in the sixth syllabus that: "Federal land banks and joint stock land banks, having been created by Congress in the exercise of its legitimate authority by the Federal Farm Loan Act of July 17, 1916, as amended by the Act of January 18, 1918, the power to make the farm loan bonds issued by them under the authority of those acts on the security of farm mortgages and notes exempt as to principal and interest from Federal, state, municipal, and local taxation, necessarily follows." This decision was rendered in 1920, at the October term of the Supreme Court of the United States, and establishes the immunity of Federal land banks, and

their instrumentalities, from state and municipal taxation.

In the recent case of Luther Pittman v. Home Owners' Loan Corp., 308 U. S. 21, 60 S. Ct. 15, 84 L. Ed. ——, 124 A. L. R. 1263, it was held that: "A state statute imposing a tax upon every mortgage recorded or offered for record, at the rate of ten cents for every $100 of the principal amount of the debt secured, is, not merely a fee for the privilege of recording the mortgage, but a tax on the mortgage itself, so as to be inapplicable to a mortgage offered for record by an instrumentality of the United States." In the fourth syllabus it also held that: "It is within the constitutional authority of Congress to provide that a corporation created by it to facilitate the performance of its governmental functions, such as the Home Owners' Loan Corporation (including loans and mortgages made and held by such a corporation) shall be exempt from state and municipal taxation." And in the fifth syllabus it is said: "The activities of a corporation through which the national government lawfully acts must be regarded as governmental functions, and as entitled to whatever immunity attaches to those functions when performed by the government itself through its departments."

In the sixth syllabus it is further held that: "Congress has the power, not only to create a corporation to facilitate the performance of governmental functions by it, but also to protect the operations thus validly authorized." And in the seventh syllabus it was said, "The power conferred on Congress to make all laws necessary and proper for carrying out the powers expressly granted to it includes the power to preserve what it has validly created or authorized." In the eighth syllabus it is held that, "In the exercise of its power to protect the lawful activities of its agencies Congress has that dominant authority which necessarily inheres in its action within the national field."

From these cases it will be seen that Congress has full power to protect the agencies it creates from state taxation, and we deem it unnecessary to go into the many other cases which could be cited to the same effect, but we shall cite one more, a Mississippi case involving the levy of a tax upon the instrumentality of the Government by the state of Mississippi, being the case of Panhandle Oil Co. v. State of Mississippi on relation of R. H. Knox, Attorney General, 277 U. S. 218, 48 S. Ct. 451, 72 L. Ed. 857, 56 A. L. R. 583, in which it was held that "States may not burden or interfere with the exertion of national power or make it a source of revenue or take the funds raised or tax the means used for the performance of Federal functions." And, further, "A state may not impose a tax measured by the quantity sold upon the privilege of one of its citizens of selling gasoline to the Federal government for use of its Coast Guard Fleet or Veterans' Hospital which the United States is empowered by the Constitution to maintain and operate." This case was decided at the October, 1927, term of the Court, and it must have been fresh in the minds of the Legislature when enacting the statute of 1934.

It is true that the United States Supreme Court, in the case of Graves v. People ex rel. O'Keefe, 306 U. S. 466, 493, 59 S. Ct. 595, 597, 83 L. Ed. 927, 120 A. L. R. 1466, overruled many cases in force for a long time prior thereto, and held that there was, in effect, no implied immunity by the Constitution in favor of either national or state government in the manner of taxation of one by the other; and it appears to have abolished all distinctions, so far as the Federal government is concerned between governmental functions and private functions engaged in by United States created corporations. In the course of its opinion in this case the Court said: "The single question with which we are now concerned is whether the tax laid by the state upon the salary of respondent, employed by a corporate instrumentality of the federal government, imposes an unconstitutional bur-

den upon that government. The theory of the tax immunity of either government, state, or national, and its instrumentalities, from taxation by the other, has been rested upon an implied limitation on the taxing power of each, such as to forestall undue interference, through the exercise of that power, with the governmental activities of the other. That the two types of immunity may not, in all respects, stand on a parity has been recognized from the beginning, McCulloch v. Maryland, supra, 4 Wheat. [316], 435, 436 [4 L. Ed. [579], 608, 609], and possible differences in application, deriving from differences in the source, nature and extent of the immunity of the governments and their agencies, were pointed out and discussed by this Court in detail during the last term. Helvering v. Gerhardt, supra, [304 U. S. 405], pages 412, 413, 416, 58 S. Ct. [969] pages 972, 973 [82 L. Ed. [1427], 1432, 1433, 1434]. So far as now relevant, those differences have been thought to be traceable to the fact that the federal government is one of delegated powers in the exercise of which Congress is supreme; so that every agency which Congress can constitutionally create is a governmental agency. And since the power to create the agency includes the implied power to do whatever is needful or appropriate, if not expressly prohibited, to protect the agency, there has been attributed to Congress some scope, the limits of which it is not now necessary to define, for granting or withholding immunity of federal agencies, from state taxation." (Citing a long list of authorities).

In the course of its opinion the Court further said: "The theory, which once won a qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable. New York ex rel. Cohn v. Graves, 300 U. S. 308, 313, 314, 57 S. Ct. 466, 467, 81 L. Ed. 666 [670, 671], 108 A. L. R. 721; Hale v. Iowa State Bd. of Assessment & Review, 302 U. S. 95, 108, 58 S. Ct. 102, 106, 82 L. Ed. 72 [80]; Helvering v. Gerhardt,

supra [304 U. S. 405, 58 S. Ct. 969, 82 L. Ed. 1427]'' and other authorities.

In other words, in this case the Supreme Court seems to have repudiated a doctrine long maintained, that there was an implied constitutional limitation on the power of one government to tax the instrumentalities of the other, but left open the question of whether or not Congress could by act forbid taxation of its instrumentalities. The question so left open was foreclosed in Pittman v. H. O. L. C., 308 U. S. 21, 60 S. Ct. 15, 84 L. Ed. ——, 124 A. L. R. 1263. The Supreme Court of the United States, in Pollock v. Farmers' Loan & Trust Co., 158 U. S. 601, 15 S. Ct. 912, 39 L. Ed. 1108, held that an income tax was, in effect, a tax upon the source of the income, and if the income was derived from a Federal instrumentality, a tax upon the income, to such extent, was a tax on the instrumentality itself, and prohibited by the Constitution. This decision was rendered in 1895, and stood as recognized law of the country until overruled in 1938, at the October term of the Supreme Court. Consequently, at the time the income tax law of 1934, chapter 120 of the Laws of 1934, was enacted, it is plain that the legislature so understood. It is said that the rule that the legislature is presumed to act with knowledge of the law should not be applied, for the reason that the act was plain on its face, and plainly applied the tax here involved.

In enacting the law, the legislature recognized that there were incomes which were beyond its power to tax. In section three of said chapter imposing the tax, it used the language, ''On the first $2,000.00 of taxable income or any part thereof, at the rate of two and one-half per centum; On the next $3,000.00 of taxable income or any part thereof, at the rate of three and one-half per centum'' and so on, until in regard to the income without limitation, the words ''taxable income'' are used. The legislature must have intended only to tax that which it understood could lawfully be taxed, and not to violate

constitutional principles and the decisions of the Court, that incomes from instrumentalities of the government could not be taxed.

Mr. Black defines ''taxable'' as follows: ''Subject to taxation; liable to be assessed, along with others, for a share in a tax. Persons subject to taxation are sometimes called 'taxables;' so property which may be assessed for taxation is said to be taxable.''

It is said in the suggestion of error that when a decision is overruled it necessarily relates back to the original time when the case so decided was overruled, and that the law then in effect should have validity from that time. He also cites cases to the effect that the Court may limit the law, when overruling the decision, to prospective operation.

We do not think that the legislature intended the shares of a national bank to be taxed, because of the Court's decisions which then held that instrumentalities of the United States could not be taxed as income. The overruling of a decision of the Court which has rendered a course of action necessary, should not operate to affect the legality of the situation under the former decisions, especially as to contracts and legislation made in pursuance of law as declared by the highest court of state or nation. Every person and every officer is obliged to accept the decisions of the highest court as binding, and their personal judgment must yield to the judicial declaration. We cannot assume that the legislature intended to oppose its private judgment, if it had a diverse opinion, to the decision of the United States Supreme Court—the highest court of the national government. It must be presumed that it enacted the law here involved with full knowledge of, and intent to be guided by, the rules then in force and declared to be constitutional by the Supreme Court of the United States.

In Chicot Co. Drainage Dist. v. Baxter State Bank, 308 U. S. 371, 60 S. Ct. 317, 84 L. Ed. ——, it was held that: ''The actual existence of a statute which has been de-

clared unconstitutional is an operative fact which cannot justly be ignored, and the question of the effect of its unconstitutionality cannot be disposed of by merely applying a principle of absolute retroactive invalidity.'' Chief Justice Hughes, speaking for the Court, said: ''The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree.'' (Citing cases.)

''It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified.''

It is true that the Court was there dealing with the question of res adjudicata, and held that where it had been adjudged and had become final, the change of judicial decision did not affect the finality of the judgment. Our own Court, in the case of Wisconsin Lbr. Co. v. State of Miss., 97 Miss. 571, 54 So. 247, overruled a former construction of the statute there involved; but held:

"Where a sale of state or public land is valid according to the laws of the state, as expounded and administered by its highest judicial tribunal when the sale was made, its validity and obligation cannot be impaired by any subsequent action of the legislature, or decision of the courts altering the construction of the law, under the Constitution of the United States, art. 1, sec. 10, and the state constitution 1890, sec. 16, prohibiting the passage of laws impairing the obligation of contracts."

In State v. Longino, 109 Miss. 125, 67 So. 902, Ann. Cas. 1916E, 371, this Court held: "Where under Code 1906, section 1169, providing that it shall be a criminal offense for the president, cashier, teller, etc., conducting the business of receiving on deposit money, etc., to receive any deposit, while knowing that the institution is insolvent, the statute was judicially declared not to apply to certain acts, but subsequently the ruling of the court was reversed, and such acts held a criminal offense under the statute, and between the two decisions defendant committed such acts. No conviction could be had under the statute in question for violations committed between the first and second decisions of the court, since the holding by the court as to whether a criminal statute is, or is not, applicable to a particular state of facts is within the spirit of the constitutional prohibition against the passage of ex post facto laws, the decision of a court in construing a statute, being as much a part of the law of the land as a legislative enactment, unlike their decision relating to the common law, which are mere evidence of the law."

It is said in the suggestion of error that this Court, in the case of Parker v. State Tax Commission, 178 Miss. 680, 174 So. 567, held that the salary of the vice president of the Federal Land Bank was subject to income tax. This case was decided in March, 1937, and overlooked or ignored the case of Federal Land Bank v. Tatum, 174 Miss. 264, 164 So. 319, in which it was held

that Federal land banks were instrumentalities of the Federal government, and that the Moratorium Law was not applicable to deeds of trust given to Federal land banks.

In the decision in the last mentioned case we followed Smith v. Kansas City Title & Trust Co., 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577, supra, holding that the mortgages and deeds of trust of such bank were not subject to such taxation; and also followed the cases of Federal Land Bank v. Crosland, 261 U. S. 374, 43 S. Ct. 385, 67 L. Ed. 703, 29 A. L. R. 1, in which Federal land banks were held to be instrumentalities of the Federal government. The case of Federal Land Bank v. Tatum, 174 Miss. 264, 164 So. 319, was decided at the September, 1935, term, and accords with the understanding of the law upon the subject of taxing instrumentalities by state and state authorities, and understands such taxes to be prohibited in such cases.

Of course, the state Court, in deciding questions arising under the Constitution and laws of the United States, is not a court of final appellate jurisdiction, and decisions in such cases are not controlling if contrary to the decisions of the Supreme Court of the United States. This is exemplified in the case of Louisville & N. R. Co. v. State, 107 Miss. 597, 65 So. 881, where the state Court had upheld chapter 122, Laws 1908, which prohibits a foreign corporation from removing cases to the Federal courts, by prohibiting it from doing an intrastate business, if it exercises such right of removal. The court of original jurisdiction, the Chancery Court, first held the statute unconstitutional, which judgment was reversed by the Supreme Court of this state, which held it to be constitutional, and remanded the case; whereupon the Chancellor again held the state statute unconstitutional. The case was reversed and remanded to the Chancery Court the second time, whereupon that court followed the directions of the Supreme Court, and entered the

proper judgment. The cause was again appealed to the Supreme Court, and in the meantime the Federal Supreme Court in Harrison v. St. Louis & S. F. R. Co., 232 U. S. 318, 34 S. Ct. 333, 58 L. Ed. 621, L. R. A. 1915F. 1187, and other cases, held that the statute prohibiting the exercise of a Federal right as a condition to doing intrastate business in the state, was unconstitutional.

After these decisions this Court reversed its former judgment, and followed the Federal Supreme Court decision, declaring the statute unconstitutional. This Court in its opinion said: "Ordinarily, the opinions heretofore rendered would constitute the law of the case, and the matters therein decided would not be again examined by us; but the law of the case rule has no application here for the reason that the right claimed by appellant is one which arises under the Constitution and laws of the United States, and with reference to all such questions this court is not one of final jurisdiction, but is simply an intermediate appellate court, from whose decision an appeal lies to the Supreme Court of the United States, the decisions of which court, in all such matters, are binding upon and must be followed by us."

Therefore, the case of Parker v. Mississippi State Tax Commission, supra, is not binding because, first, it is not applicable to the case here; second, because one division of the Court cannot overrule a prior state court decision, and cannot overrule the decisions of the United States Supreme Court; and, as stated, it is not a final authority.

We deem it unnecessary to go further into the discussion of the question presented, because the authorities cited in the former opinion in this case sustain the holding of the controlling opinion heretofore delivered. It would require a protracted opinion to discuss the various cases and point out the distinctions, and recognize their different holdings, even if that can be done. Such

an opinion would require a volume, rather than conform to the length of a Court opinion.

It follows from what we have said that the suggestion of error must be, and is, hereby overruled.

**Smith, C. J.**, and **Griffith** and **Anderson, JJ.**, dissenting.